UNITED STATES of America, Plaintiff,

and

Nellie Mae Webb et al., Intervenors,

v.

The SCHOOL DISTRICT OF OMAHA, STATE OF NEBRASKA, et al. Defendants.

Civ. No. 73-0-320.

United States District Court, D. Nebraska.

Oct. 15, 1974.

Ross L. Connealy, Dept. of Justice, Washington, D. C., for plaintiff.

Robert V. Broom, R. Ladd Lonnquist, Legal Aid, Omaha, Neb., and Robert Pressman and Stephen E. Cotton, Center for Law and Education, Cambridge, Mass., for intervenors.

Gerald P. Laughlin, Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This school desegregation case was filed by the United States on August 10, 1973, under the authority of 42 U.S.C. § 2000c–6(a). Jurisdiction is also present under 28 U.S.C. § 1345. The defendants are the School District of Omaha, State of Nebraska; the Superintendent of Schools for the School District; and the twelve members of the Board of Educa-

tion for the School District. The plaintiff's complaint alleges that the defendants have engaged in racial discrimination in the operation of the Omaha Public Schools in violation of Title IV of the Civil Rights Act of 1964 and the Fourteenth Amendment to the United States Constitution. The defendants deny that the Omaha Public Schools have been operated in a manner which discriminates against any students on the basis of race, and affirm the School District's adherence to a racially neutral neighborhood school assignment policy.

The plaintiff's complaint was accompanied by a motion for a preliminary injunction. A full evidentiary hearing was held, and the motion was denied, United States v. School District of Omaha, State of Nebraska, 367 F.Supp. 179 (D.Neb.1973). Thereafter, certain black children attending the Omaha Public Schools and their parents, representing a class of all other similarly situated black children and their parents, were permitted to intervene as plaintiffs in this lawsuit under Rule 24(b), Fed. R.Civ.P., 367 F.Supp. 198 (D.Neb.1973).

The trial of this case was begun on March 4, 1974, and concluded on March 20, 1974. A schedule for the preparation of post-trial briefs and proposed findings of fact was established, and the entire matter was submitted to the Court on June 5, 1974.

The Omaha Public Schools have never been operated under a statutorily or constitutionally required dual system. Therefore, the legal principles upon which claims with respect to this school system must be resolved are those set forth by the Supreme Court in Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Under *Keyes,* a constitutional violation is found where:

1) There is a current condition of racial segregation; and

2) This condition has been caused or maintained by intentional state action.

There is no question here that the actions of the defendants constitute state action. Nor is it open to doubt that there is a substantial degree of racial imbalance within some of the Omaha Public Schools. The issue upon which this litigation is focused is whether the racial imbalance has been intentionally caused or maintained by the defendants.

A determination of the intent of a person or a public body with respect to action or inaction on any question is necessarily difficult. In evaluating the evidence introduced at trial the Court has kept in mind certain principles concerning the finding of intent:

■ 1) The burden of proof on this issue lies upon the plaintiff and the intervenors to show an intentionally segregative policy practiced in a meaningful or significant portion of the school system. The burden then shifts to the defendants to show that their actions as to any other segregated schools within the system were not motivated by segregative intent. *Keyes,* 413 U.S. at 208–209, 93 S.Ct. 2686.

2) There are very few school desegregation cases in which the defendants admit segregative intent. Such intent must then be inferred from objective actions of the defendants. United States v. Board of School Commissioners of Indianapolis, Indiana, 474 F.2d 81 (7th Cir. 1973), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

■ 3) There is some dispute among the parties concerning how the Court is to weigh the natural and foreseeable consequences of the defendants' decisions to act or not to act in any given area. Prior to *Keyes,* it had been held that school boards were accountable for the natural and foreseeable consequences of their actions, regardless of intent or motivation, United States v. Texas Education Agency, 467 F.2d 848, 863–865 n. 25 (5th Cir. 1972). This view no longer appears to be the law in light of the *Keyes* emphasis on intent. The Ninth Circuit has specifically so held, Johnson v. San Francisco Unified School District, 500 F.2d 349 (1974); Soria v. Oxnard School District Board of Trustees, 488 F.2d 579 (9th Cir.

1973). But the error reversed in *Johnson* and *Soria* was the rejection by the trial courts of the importance of determining intent, not the method of determining it. This Court is of the opinion that the natural and foreseeable consequences of the defendants' actions are neither determinative nor immaterial, but rather constitute one additional factor to be weighed in evaluating the defendants' overall intent. Oliver v. Kalamazoo Board of Education, 368 F. Supp. 143 (W.D.Mich.1973).

## I. BACKGROUND

The defendant School District of Omaha has within its boundaries the majority of the City of Omaha, Nebraska, as well as a part of Sarpy County, Nebraska. A portion of Omaha in the southwest sector of the City is served by School District 66. The schools operated by the defendants, however, are commonly referred to as the Omaha Public Schools. United States census data show that in 1940 there were 12,015 black citizens in Omaha, comprising 5.3 per cent of the population. By 1950 the number was 16,311, or 6.5 per cent of the total. In 1960 it was 25,155, or 8.3 per cent, and in 1970, it was 34,431, or 9.9 per cent. By way of comparison, the percentage of black students enrolled in the Omaha Public Schools has increased from 6.6 per cent in 1940 to 9.4 per cent in 1950, to 14.2 per cent in 1960, to 18.6 per cent in 1970, and to 19.8 per cent in 1973–74.

During the 1950's, black persons in Omaha resided generally in an area known as the Near North Side, bounded roughly by Cuming Street on the south, Wirt Street on the north, 33rd Street on the west, and Florence Boulevard on the east. Census tract information is available which was compiled by the School District of Omaha as required by state law and which shows the concentration of black school age children, ages five through twenty, throughout the City on a scale of less than one per cent, one to twenty-five per cent, twenty-six to fifty per cent, fifty-one to seventy-five per cent, and seventy-six to one hundred per cent. This information shows that in 1952–53, the only elementary attendance zone with as high as seventy-six to one hundred per cent black school age children was the Long school zone. This zone sits almost directly in the center of the Near North Side. The only zones with fifty-one to seventy-five per cent black school age children were Lake, immediately to the northeast of Long, and Howard Kennedy, immediately to the northwest of Long. The only zone with twenty-six to fifty per cent black school age children was Kellom, immediately to the southeast of Long. Various other zones had one to twenty-five per cent black school age children, and they were scattered near the schools above mentioned and in the eastern and southeastern portion of the School District.

By 1959–60, there were seventy-six to one hundred per cent residential concentrations of black school age children in the Long, Howard Kennedy and Lothrop (immediately north of Lake) zones. Fifty-one to seventy-five per cent concentration resided in the Lake and Druid Hill (immediately north of Kennedy and west of Lothrop zones). The only twenty-six to fifty per cent concentration was again in Kellom. One to twenty-five per cent concentrations resided on the north and southwest fringes of the above-mentioned schools, in two isolated schools in the central portion of the District, and in a cluster of seven zones in the southeastern portion of the District.

By 1969–70, there were seventy-six to one hundred per cent residential concentrations of black school age children in the Long, Kennedy, Lake, Kellom, Lothrop and Druid Hill zones. Fifty-one to seventy-five per cent concentrations resided in the Monmouth Park (immediately to the northwest of Druid Hill). Saratoga (immediately to the north of Lothrop) and Franklin (immediately to the west of Long and Kennedy) zones. Twenty-six to fifty per cent concentrations resided in the Clifton Hill (immediately to the west of Franklin, Kennedy and Druid Hill), Central Park (immedi-

ately to the west of Monmouth Park) and Indian Hill (in the southeastern portion of the District) zones. Schools with one to twenty-five per cent concentrations generally bordered the above-mentioned zones. Thus, by 1969–70, the last year for which these census tracts are in evidence, there can be seen a definite increase in the concentration of black school age children residing in the northern and eastern portions of the District, including the area referred to in the 1950's as the Near North Side, and a gradual increase in concentration in the zones to the west and north of the Near North Side. Also, there was by 1969–70 a small but apparently growing concentration of black children residing in the southeastern portion of the District.

## II. ELEMENTARY SCHOOLS

For the school year 1973–74, there were seventy-nine elementary schools within the defendant School District, serving 33,495 students, of whom 6,876 (or approximately twenty per cent) were black. The elementary schools are the heart of the defendants' neighborhood school policy. Geographic boundaries are drawn for each school and the students living within the boundaries of a certain school are expected to attend that school.

The plaintiff and intervenors allege that in the elementary schools the defendants have departed from the neighborhood school policy in two ways and that these departures have been made with segregative intent. They are:

1) The adding of capacity to relieve overcrowding.
2) The alteration of attendance zones.

## 1) THE ADDING OF CAPACITY

There have been periods in the operation of the Omaha Public School System in which many of the elementary schools have enrolled numbers of students in excess of the published capacities for those schools. The School District's response to these overcrowding problems

has generally been either to increase the capacity at the existing schools by use of temporary classrooms, or to construct new schools (the discussion of which is found at page 42, *infra.*) The earliest use of temporary classrooms by the defendant School District which is reflected in the record is in the early 1950's, and the evidence shows an increasing use of temporary classrooms throughout the 1960's and to the present time. Currently there are substantial numbers of temporary classrooms in schools with high black enrollments. However, there are also substantial numbers of such units in the far northern and western portions of the School District, in predominantly white schools located in predominantly white residential areas.

As discussed earlier in this opinion, there has been a general shifting of the concentration of the black student population within the School District in the northerly and westerly directions from the area once known as the Near North Side. There has been no showing that the placement of temporary classrooms has corresponded to this shifting, and there is no support in the record for a conclusion that these units have been placed in certain schools for the purpose of containing black students in those schools.

The plaintiff and intervenors complain specifically of the placement of temporary classrooms at Franklin and Clifton Hill schools. These schools have adjacent attendance zones and are located in the north-central portion of the School District. The racial compositions of both schools have followed a parallel course: predominantly white throughout the 1950's;[1] majority white in the mid-1960's; majority black in the mid-late 1960's; currently predominantly black. Thus, the enrollments at these schools reflect the black residential shift mentioned earlier. Also, both of these schools began experiencing increasing

---

1. Throughout this litigation the parties have used the term "predominantly" to refer to racial compositions in excess of sixty-five per cent.

enrollments in the early to mid-1960's. The School District's response was to supply these buildings with temporary classrooms. By 1971–72, Franklin was over-capacity by 317 pupils and had thirteen temporary classrooms, while Clifton Hill was 255 pupils over capacity and had twelve temporary classrooms. The schools adjacent to Franklin on the south, southwest and west, are Yates, Saunders and Walnut Hill, respectively, which have always been predominantly white and which through 1971–72, had generally been under the published capacity. The schools adjacent to Clifton Hill on the west and northwest are Rose Hill and Fontenelle, respectively, which through 1971–72 were predominantly white and under capacity.

The plaintiff and intervenors argue that substantial reductions in racial imbalance at all the above-mentioned schools would have resulted if the School District had restructured the attendance requirements for these schools (e. g., by redrawing boundaries or by reassigning grades of students), and that the failure of the School District to do so is evidence of segregative intent.

The Court agrees that some restructuring was possible which would have increased a better racial balance at all these schools, and that by continued restructuring over the years, a substantial degree of integration could have been maintained. But it is also clear that at the time in question, this restructuring of enrollments, whether by the altering of attendance zones or by the shifting of grades between schools, simply was not a method used by the School District to alleviate overcrowding. There is some evidence of such practices in the 1950's and early 1960's, but the amount of this restructuring was, even then, not substantial. By the mid-1960's, it is clear that the School District emphasized use of temporary classrooms as the primary measure for dealing with increased enrollments.

Further, the Court notes that the increase of capacity by use of temporary classrooms had an integrative effect for some schools. For example, from 1964–65 through 1972–73, the black enrollment at Miller Park increased from seven to 245 (1.1 per cent to 40.5 per cent) and the number of temporary classrooms increased from zero to ten. From 1967–68 through 1972–73, the black enrollment at Belvedere increased from 23 to 221 (2.5 per cent to 24.7 per cent) and the number of temporary classrooms grew from zero to six. From 1962–63 through 1972–73, the black enrollment at Central Park grew from three to 348 (.4 per cent to 46.9 per cent) and the number of temporary classrooms grew from three to ten.

This evidence does not, of course, prove that the School District used temporary classrooms with an integrative intent. But it is some evidence that the Board acted with no racial intent at all, and this is precisely the Court's conclusion. The evidence presented simply shows that use of temporary classrooms was the School District's choice for dealing with the overcrowding; that there was no pattern or design of placement of these classrooms on a racially discriminatory basis; and that, therefore, any segregative effects of the use of temporary classrooms were not intentionally caused or maintained by the defendants.

2) ALTERATION OF ATTENDANCE ZONES

As mentioned previously, changes in elementary attendance boundaries have been infrequent in the Omaha Public Schools. There are two such changes, however, which the plaintiff and intervenors allege had a segregative effect and which were made by the School District to achieve that effect.

The first of these concerns Druid Hill and Monmouth Park Schools. Between 1957–58 and 1958–59, a portion of land just north and west of the Belt Line Railway was removed from the Druid Hill (majority black) zone and added to the Monmouth Park (predominantly white) zone. There is no way of determining the number of students involved in this transfer, nor their race, although an in-

ference is permissible from other exhibits and evidence that this residential area was largely white. In any event, the adjustment is plausibly explained by the School District, and the Court finds that this explanation is devoid of any segregative intent: in the spring of 1958 a Druid Hill student crossing the Belt Line railroad tracks going home for lunch was nearly struck by a train. Thereafter, the portion of the Druid Hill zone across the tracks and nearest to Monmouth Park School was assigned to that school until 1965, when a cafeteria was installed in Druid Hill.

The second boundary adjustment also occurred between 1957–58 and 1958–59, when a primarily white residential section of the Webster (majority white) zone was removed from that school and added to the adjacent Yates (predominantly white) zone. In 1959–60, the Webster seventh and eighth grades were removed from that school and assigned to Technical Junior High, which was rapidly becoming majority black. The seventh and eighth grades were retained at Yates. The plaintiff and intervenors allege that this boundary change between 1957–58 and 1958–59 thus permitted white seventh and eighth grade students to avoid attendance at Technical Junior High. The facts, however, show no sudden increase in the Yates seventh and eighth grade enrollment. The Yates grade to grade progression for the 1959–60 seventh and eighth grade students shows a relatively constant pattern—1956–57 fourth and fifth grades: 45 and 33; 1957–58 fifth and sixth grades: 44 and 36; 1958–59 sixth and seventh grades: 44 and 43; 1959–60 seventh and eighth grades: 44 and 38. Thus, the

Court concludes that few, if any, seventh and eighth grade students were thus excluded from Technical Junior High and that there was no segregative effect to this boundary change.

In conclusion, the Court finds that these two instances of boundary changes were not prompted by any segregative intent of the School District, and with regard to the Yates Webster situation, the Court finds that there was not even any segregative effect.

### III. JUNIOR HIGH SCHOOLS

■ The plaintiff and intervenors allege that the operation of the junior high system, especially as it concerns Technical Junior High and Horace Mann Junior High evidences segregative intent on the part of the Omaha School District. They further allege that this segregative intent can be determined in three ways:

1) Through the initial placement of the junior highs and the establishment of elementary feeder schools for them;

2) Through the manner in which the elementary programs were converted from K–8 through K–6, including the retention of some schools as K–8;

3) Through the establishment of optional attendance zones for some seventh and eighth grade students.[2]

The plaintiff and intervenors argue that by these means the School District has concentrated black students in Technical Junior High and Horace Mann Junior High and has permitted white students who live near these schools to avoid mandatory assignment to them. The School District denies the existence of segregative intent, reaffirms its application of a racially neutral neighbor-

2. The plaintiff and intervenors also allege that in two instances the defendants deliberately formulated student assignment policies so as to avoid sending white students to Technical Junior High. The first of these concerns the defendants' alleged practice of sending white ninth grade students from the overcrowded Lewis and Clark Junior High past the Technical facility to Central from 1960–61 through 1962–63. The second concerns the failure of the defendants to provide Technical High as an option for ninth grade students new to the City or entering the public schools from parochial schools, both of which dealt with certain limited areas of the School District.

The evidence on these points is far from clear, and does not establish that these were indeed the defendants' practices. Moreover, there is no basis for determining the number of students, if any, affected by these alleged policies. The Court, therefore, does not consider them evidence of segregative intent.

hood policy, and offers explanations for deviations therefrom.

## 1) INITIAL PLACEMENT AND FEEDER PATTERNS

Prior to approximately 1950, the Omaha School District provided instruction in two school settings, one for grades K through 8, and another for grades 9 through 12. The junior high system, whereby grades 7 through 9 are offered and housed in a separate setting, was proposed to the Omaha Public School System as early as 1917, although no action on this proposal was taken at that time. The idea was revived in the 1951 Study of Plant Facilities and Requirements published by the Omaha Board of Education. Nine junior highs were proposed—one for each of nine geographical portions of the District. Some were to be housed in buildings to be constructed, some in converted elementary facilities, and one (Technical Junior High) in a portion of a senior high school building.

For the areas in which substantial concentrations of black school age children later came to reside, two junior highs were proposed. The first of these was Technical Junior High, located on the site of Technical Senior High at 33rd and Cuming Streets, which was on the southwestern border of the area known as the Near North Side. The designated feeder elementary schools for Technical Junior High and their racial enrollments for the 1951–52 school year as compared to the 1973–74 school year are as follows:

| | 1951–52 | | 1973–74 | |
| | White | Black | White | Black |
|---|---|---|---|---|
| Central Grade | 431 | 5 | 107 | 21 |
| Kellom | 365 | 356 | 40 | 470 |
| Lake | 254 | 319 | 38 | 141 |
| Long [3] | 0 | 433 | 32 | 355 |
| Webster | 223 | 122 | Closed after | 1968–69 |
| Yates | 367 | 0 | 196 | 50 |
| TOTAL | 1,640 | 1,235 | 413 | 1,037 |

The second of these junior highs was to be made by removing the elementary students from Druid Hill School and con-

verting it to a junior high. The feeder schools and their racial enrollments for the 1951–52 school year as compared to the 1973–74 school year are as follows:

| | 1951–52 | | 1973–74 | |
| | White | Black | White | Black |
|---|---|---|---|---|
| Central Park | 566 | 0 | 307 | 351 |
| Druid Hill | 260 | 55 | 35 | 308 |
| Monmouth Park | 400 | 0 | 98 | 353 |
| Howard Kennedy | 4 | 346 | 3 | 622 |
| Lothrop | 511 | 258 | 11 | 627 |
| Saratoga | 587 | 0 | 77 | 522 |
| TOTAL | 2,328 | 659 | 531 | 2,783 |

By 1955, none of these junior highs, with the exception of Technical Junior High on a limited basis, were in operation. The 1955 Study of School Enrollment and Plant Facilities published by the Omaha School Board proposed a new system of eleven junior highs. For the areas which then and later had substantial concentrations of black school age children, three junior highs were proposed. The first was again Technical Junior High, which had already received the seventh and eighth grades from Kellom and Central Grade Schools. The proposed feeder schools for Technical Junior High and their racial enrollments for 1955–56 as compared to 1973–74 are as follows:

| | 1955–56 | | 1973–74 | |
| | White | Black | White | Black |
|---|---|---|---|---|
| Franklin | 683 | 19 | 80 | 554 |
| Kellom | 376 | 481 | 40 | 470 |
| Webster | 227 | 118 | Closed after | 1968–69 |
| TOTAL | 1,286 | 618 | 120 | 1,024 |

In place of the converted Druid Hill Junior High of the 1951 study, the 1955 study proposed a Paxton Boulevard junior high. The proposed feeder schools and their racial enrollments for 1955–56 as compared with 1973–74 are:

| | 1955–56 | | 1973–74 | |
| | White | Black | White | Black |
|---|---|---|---|---|
| Central Park | 680 | 0 | 307 | 351 |
| Druid Hill | 241 | 175 | 35 | 308 |
| Monmouth Park | 537 | 0 | 98 | 353 |
| Saratoga | 649 | 3 | 77 | 522 |
| TOTAL | 2,107 | 178 | 517 | 1,534 |

---

3. Long has been replaced by Conestoga.

In addition to these, the 1955 Study also proposed a Near North Side junior high, to be erected on the northern edge of Adams Park, although the Board realized acquisition of park property would be difficult. The feeder schools for this junior high and their racial enrollments for 1955–56 as compared with 1973–74 are:

| | 1955–56 | | 1973–74 | |
| | White | Black | White | Black |
|---|---|---|---|---|
| Howard Kennedy | 41 | 726 | 3 | 622 |
| Lake | 312 | 508 | 38 | 141 |
| Long | 34 | 480 | 32 | 355 (Conestoga) |
| Lothrop | 382 | 603 | 11 | 627 |
| TOTAL | 769 | 2,317 | 84 | 1,745 |

During the years 1956–62, a number of junior highs were opened in the Omaha School District. Neither the Paxton Boulevard junior high nor the Near North Side junior high were among them. However, a new junior high was constructed near Twentieth and Pratt Streets, approximately five blocks north of the Near North Side. This School, Horace Mann Junior High, opened in the 1959–60 school year. The racial enrollment at Mann was 177 white and 443 black in that year and has been predominantly black ever since. In 1958–59, McMillan Junior High, also in a new building, was opened at 38th and Redick Streets, to the north and west of Mann. It was completely white when opened but the percentage of blacks has steadily increased and in 1973–74, black students comprised thirty-six per cent of the enrollment.

With respect to Technical Junior High, the foregoing paragraphs describe the planned feeder schools. However, these plans never materialized. The actual evolution of the Technical Junior High[4] zone consisted of the piecemeal designa-

tion of various elementary schools to Technical Junior High as follows:

| Junior High Year 7th & 8th Grades Assigned to Technical | | Enrollment at This School for that Year | | Enrollment at Technical Junior High for that Year | |
| | | White | Black | White | Black |
|---|---|---|---|---|---|
| Kellom | 1950–51 | 402 | 350 | 66 | 76 |
| Central Grade | 1951–52 | 431 | 5 | 162 | 135 |
| Long | 1955–56 | 34 | 480 | 171 | 162 |
| Franklin | 1957–58 | 618 | 18 | 274 | 273 |
| Webster | 1959–60 | 143 | 111 | 363 | 323 |

On a geographical basis, these five schools were the closest to Technical Junior High with the exception of Yates and the possible exceptions of Saunders and Walnut Hill, all of which were predominantly white from 1950 to the present.

After 1959–60, enrollment at Technical Junior High was amplified only by its assignment as an optional junior high for certain elementary schools and the designation of Yates as a feeder school in 1970–71. In 1960–61 and 1961–62, Technical Junior High was majority white. In 1962–63, it turned majority black and from that point on, the percentage of black students has risen steadily, reaching over ninety-five per cent in the late 1960's. The junior high program at Technical was closed after the 1971–72 school year.

With the exceptions described below, students are and have been assigned to junior high schools according to the neighborhood school policy. Geographic boundaries exist for each junior high which generally correspond to the boundaries of designated elementary schools near that junior high. Thus these elementary schools become feeders for the junior highs. In some cases the junior high boundary may not correspond exactly to the elementary school boundary, and two students who attended the

---

4. After the School District converted to the K–6–3–3 system, the other junior highs eventually housed grades 7–9, and the senior highs grades 10–12. At Tech, however, the junior high has always housed only grades 7–8, while the senior high housed grades 9–12. Central, North and South High Schools also house ninth grade students.

same elementary school may be assigned to different junior highs.

## 2) CONVERSION FROM K–8 TO K–6

Most elementary schools lost their seventh and eighth grades to junior high schools during the 1956–62 junior high construction. As of the 1962–63 school year, there were sixteen elementary schools which were still housing the seventh and eighth grades. These schools were located across the entire middle and eastern portion of the School District, in both the north and south parts of the City, and in both the black and white residential areas. By the 1964–65 school year, only seven of these schools remained K–8. Four of these seven, Jackson, Mason, Walnut Hill and Yates, were located such that the closest junior high was Technical Junior High. Two of the seven, Pershing and Sherman, were located such that the closest junior high was Mann. For the school years 1964–65 through 1971–72 all six of these elementary schools had predominantly white enrollments, while Technical Junior High and Mann were both predominantly black.[5]

Aside from certain limited testimony concerning Yates School,[6] there is no direct evidence concerning the intent of the defendant School District in failing to convert any of the elementary schools from K–8 to K–6.

For the years 1964–65, through 1971–72, the number of seventh and eighth grade students retained at these six elementary schools is as follows:[7]

| SCHOOL | 1964–65 | 1965–66 | 1966–67 | 1967–68 | 1968–69 | 1969–70 | 1970–71 | 1971–72 |
|---|---|---|---|---|---|---|---|---|
| Mason | 90 | Converted to K–6 | | | | | | |
| Jackson | 63 | 85 | 64 | 66 | 63 | 66 | 62 | 70 |
| Walnut Hill | 104 | 113 | 111 | Converted to K–6 | | | | |
| Yates | 58 | 70 | 70 | 52 | 54 | 34 | Converted to K–6 | |
| Pershing | 110 | 103 | 87 | 70 | 55 | 49 | 52 | 50 |
| Sherman | 125 | 114 | 128 | 119 | 116 | 111 | 119 | 123 |

Of these six schools, only Sherman and Pershing at any time had enrollments in excess of their building capacity, and never to a serious degree. On the other hand, Technical Junior High and Mann consistently had enrollments somewhat below published capacity:

| SCHOOL | 1964–65 | | 1965–66 | | 1966–67 | | 1967–68 | | 1968–69 | | 1969–70 | | 1970–71 | | 1971–72 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | E | C | E | C | E | C | E | C | E | C | E | C | E | C | E | C |
| Technical Junior High | 653 | 795 | 630 | 795 | 667 | 795 | 637 | 795 | 641 | 795 | 641 | 795 | 598 | 795 | 606 | 795 |
| Mann | 1000 | 1380 | 1051 | 1380 | 986 | 1380 | 880 | 1380 | 819 | 1380 | 827 | 1380 | 832 | 1380 | 882 | 1307 |

---

5. The seventh elementary school, Ashland Park, had a predominantly white enrollment but was located closer to junior highs other than Technical or Mann. It was converted to K–6 in 1965–66.

6. In early 1969, officials of the School District proposed removing the seventh and eighth grades from Yates and assigning these students to Technical Junior High, which was approximately five blocks away. In 1968–69 Yates enrolled 54 seventh and eighth grade students and its total enrollment was 317 white and 7 black, while the enrollment at Technical Junior High was 25 white and 616 black.

Parents of Yates students attended a meeting of the Board of Education in the Spring of 1969 and expressed opposition to having their children attend junior high in a building that housed a senior high. The Board of Education permitted a one-year delay, and the Yates seventh and eighth grades were assigned to Technical Junior High beginning in 1970–71.

7. The racial composition of these seventh and eighth grades is unknown, although presumably it mirrors that of the school as a whole. During these years, each of the elementary schools was predominantly white in total enrollment.

With respect to the four elementary schools closer to Technical Junior High, the only zone from which transportation to Technical would be difficult is Mason, where, due to the commercial and highway development separating these areas, transportation would have posed a serious problem.

With respect to the two elementary schools closer to Mann, the situation is somewhat different. The Pershing and Sherman zones are relatively isolated from the rest of the School District in the northeastern corner thereof, in areas sparsely populated and containing increasing commercial and industrial development. The driving distances between the Sherman and Mann buildings is 1.7 miles, but the distance is greater for most of the Sherman zone. The driving distance between the Pershing and Mann buildings is 3.1 miles.

The isolation of the Pershing and Sherman zones was recognized by the School District in the 1955 Study of School Enrollment and Plant Facilities, in which it was recommended that a separate, smaller-than-usual junior high facility be built at Sherman School to accommodate both Sherman seventh and eighth grade students and those from the expected annexation of East Omaha (served by Pershing School). This annexation did occur and the smaller junior high recommendation was made again in 1962, but an expected population increase in the area never materialized and this junior high was never built. Pershing and Sherman are currently and always have been K–8 schools, although for two years, 1960–61 and 1961–62, students from both schools had the option of attending Mann (predominantly black), McMillan (predominantly white), or staying at their previous elementary school. The evidence does not permit a conclusion as to how the options were exercised, if at all.

## 3) OPTIONAL ATTENDANCE ZONES

The plaintiff and intervenors are also concerned with the School District's practice of creating optional attendance zones for seventh and eighth grade students from certain elementary schools near Technical Junior High. The schools with these options were Mason, Saunders and Walnut Hill. The following are relevant statistics for the time period involved:

| SCHOOL | Driving Distance to Optional Junior Highs | Racial Enrollment in Year Option Created | |
| --- | --- | --- | --- |
| | | White | Black |
| Saunders | 1.0 miles to Technical | 1964–65 | |
| | 2.2 miles to Norris | | |
| | 2.5 miles to Lewis & Clark | 178 | 0 |
| Mason | 1.9 miles to Technical | 1965–66 | |
| | 2.7 miles to Norris | | |
| | 2.3 miles to Bancroft | 447 | 12 |
| Walnut Hill | 1.3 miles to Technical | 1967–68 | |
| | 3.3 miles to Norris | | |
| | 2.5 miles to Lewis & Clark | 432 | 8 |

Technical Junior High

| | White | Black | Total | Stated Capacity |
| --- | --- | --- | --- | --- |
| 1964–65 | 254 | 399 | 653 | 795 |
| 1965–66 | 223 | 407 | 630 | 795 |
| 1966–67 | 160 | 507 | 667 | 795 |
| 1967–68 | 69 | 568 | 637 | 795 |

Bancroft, Lewis and Clark and Norris Junior High Schools were all predominantly white during this time period.

The above information gives the statistical background concerning the optional attendance zones; information concerning the actual exercise of these options is available for the 1971–72 school year only and is as follows:

Children residing in the Walnut Hill zone:

| | | Racial Composition | |
| --- | --- | --- | --- |
| | | White | Black |
| To Technical Junior High | – 3 | 48 | 551 |
| To Lewis and Clark | – 90 | 1,205 | 21 |
| To Norris | – 5 | 1,407 | 10 |

Children residing in the Saunders zone:

| | |
| --- | --- |
| To Technical Junior High | – 1 |
| To Lewis and Clark | – 21 |
| To Norris | – 23 |

Children residing in Mason zone:

| | | | |
| --- | --- | --- | --- |
| To Technical Junior High | – 1 | | |
| To Norris | – 25 | | |
| To Bancroft | Not Available | 473 | 2 |

At the end of the 1971–72 school year, Technical Junior High was closed. The Saunders and Walnut Hill options were continued to Lewis and Clark and Norris, while the seventh and eighth grade students from Mason were assigned either to Bancroft or Norris, depending upon their street address.

In addition to these three optional attendance zones, there have been nine other elementary schools throughout the School District which either currently or in the past have had options concerning junior high attendance. With regard to eight of these nine schools, Conestoga, Harrison, Irvington, Pershing, Ponca, Rose Hill, Sherman and Washington, the evidence indicates that exercise of these options to the various junior high schools involved had no significant segregative or integrative effect. The ninth school was predominantly black (Druid Hill, 1966–67: 25 white, 568 black). In 1967–68 seventh and eighth graders in a portion of the Druid Hill zone were given options to attend predominantly black Mann (1966–67: 23 white and 963 black) or predominantly white McMillan (1966–67: 1303 white and 119 black). Mann was approximately one mile and McMillan approximately two and a half miles from the center of the optional zone. No precise records are in evidence concerning the exercise of this option, but for 1967–68, the total enrollment at McMillan showed an increased of 42 black students and a decrease of 44 white students, while at Mann there was a decrease of 105 black students and 1 white student. Thus, the option, for the year 1967–68, had some integrative effect. This option continues to the present.

## CONCLUSIONS

The foregoing constitute the Court's findings of fact concerning the junior high system in the Omaha School District. From these findings the Court is able to draw certain conclusions. The first such conclusion is that there was no segregative intent on the part of the defendant School District in the establishment of the junior high system or in its assignment of feeder schools for the various junior highs. The evidence shows that the District's proposals for the various junior highs were consistently made on a geographical basis and that the race of the students expected to attend these schools was never a consideration. Of the junior highs which were ultimately built and operated, there were at times two—Technical and Mann—and there is currently one—Mann—which have enrolled a predominantly black student body. However, there appears in the record no evidence to indicate desire or design by the School District that this should occur. In both the 1951 and 1955 Studies, the combined enrollments of the feeder schools for the junior highs which ultimately became Technical and Mann were, as of those years, predominantly white. The only proposed junior high with feeder schools enrolling even a combined majority of black students was the 1955 Near North Side junior high, the erection of which was recognized then to be improbable, and which was, in fact, never built.

The evidence shows a constant increase in the concentration of black school age children in the areas to the north and west of what was once known as the Near North Side, and this increase is reflected in the racial enrollment of the various feeder schools, and consequently in the junior highs.

With respect to the conversion of K–8 schools to the K–6 system, the Court finds that this policy in itself was racially neutral and was not indicative of any segregative intent. The policy was not totally applied to all schools at the same time and certain exceptions were made which deviated from the conventional neighborhood school basis and which plaintiff and intervenors argue demonstrate a segregative intent. However, as stated at the outset, the burden of proof here is upon plaintiff and intervenors to show an intentionally segregative policy practiced in a meaningful or significant portion of the school system. Only then does it become incumbent upon the defendants to prove that their

actions or nonactions were not motivated by segregative intent. The Court is not of the opinion that plaintiff and intervenors have met this burden in connection with this particular policy. First of all, the record shows that Mason converted to K–6 by 1965–66, Walnut Hill by 1967–68, and Yates by 1970–71. The record is unclear and undeveloped as to the status of Jackson at this time, although there is some evidence to indicate that the K–8 policy is still in existence at that school. The record further shows that Yates was permitted a one-year delay from 1969–70 to 1970–71 for conversion because of a request from the parents of the Yates students based upon the opposition to the children attending a junior high (Technical) which was housed with the senior high. There is some evidence as to the personal opinions of a school board member and a school board employee as to the reason for the parents' request having to do with racial factors, but the Court considers this testimony to have little, if any, probative value and it is not persuasive of the plaintiff and intervenors' contentions. Furthermore, if this particular policy was creating or continuing a racial imbalance, it was remedied by 1970–71 [8] which would have heavily discounted an "intentionally segregative policy practiced in a meaningful or significant portion of the school system." Also, heavily discounting such segregative intent is the fact that a portion of an adjacent zone (Webster) was transferred to the Yates zone in 1969 which thereby increased the black enrollment at Yates from two per cent to thirteen per cent.

Furthermore, the Court concludes that the geographic isolation of the Sherman and Pershing schools was and is a sufficient reason for the School District to permit the seventh and eighth grade students to remain in those buildings and that this decision is consistent with the District's neighborhood school policy. The Court further concludes that the necessary segregative intent has not been demonstrated by the plaintiff and intervenors with reference to the seventh and eighth grades at Jackson, Mason, Walnut Hill and Yates, and that the reasons advanced for those respective retentions of K–8 policy until 1970–71 were not motivated by or indicative of a segregative intent on the part of the defendants practiced in a meaningful or significant portion of the school system.

Considering next the optional attendance zones, the Court finds that the maintenance of such a system presented a necessary and reasonable deviation from the neighborhood school policy. Historically, and most frequently during the 1960's, optional zones were frequently used when the junior high schools came into being and were in existence throughout the District. The optional zone from Walnut Hill in 1967–68 was created when enrollments at Monroe Junior High made it impossible to assign Walnut Hill as a feeder school to that particular junior high school, which would have been the most desirable arrangement inasmuch as Walnut Hill fell within the Benson High attendance area, Benson High and Monroe occupying the same site. In the same year that the Walnut Hill optional zone was created, seventh and eighth grade students in a portion of the Druid Hill zone, which was predominatly black, were given the option of attending Mann Junior High (predominantly black) or McMillan Junior High (predominantly white), even though McMillan was approximately one and a half miles farther away from this area than Mann. Insofar as the Mason optional zone is concerned, this was created in 1965 when Bancroft Junior High first opened in order to give the seventh and eighth graders from that area an alternative in transversing a commerical area and extensive interstate highway construction in order to reach Technical Junior High. Saunders Elementary School had never been proposed

---

8. The only possible exception is Jackson which in and of itself would fall short of demonstrating a practice involving a meaningful or significant portion of the school system.

as a feeder school for Technical Junior High, either in 1951 or 1955. In these years there was a proposal that a portion or all of Saunders be assigned to the Dundee or Western Avenue Junior High respectively. The Dundee and Western Avenue Junior Highs ultimately merged in what was to be known as Lewis and Clark which, because of the availability of open land space, was located at the westernmost part of the zone which it was to serve. Saunders, therefore, was made an optional zone to Lewis and Clark or Technical or Norris in 1964–65 when the record shows that enrollments at Technical Junior High were up and enrollments at Lewis and Clark were down. From this evidence, the Court concludes that in these three instances, the School District deviated from the neighborhood school policy for sound, administrative reasons, and its judgment was not based upon racial reasons or a segregative intent. In this connection, it should further be noted that a significant measure of racial balance was achieved so far as Druid Hill was concerned because of this optional zone policy which, again, would discount overall an intentionally segregative policy. It is here noteworthy to point out the observation made by the Court in the case of Higgins v. Board of Education, Grand Rapids, Michigan, No. CA 6386 (W.D.Mich., Filed July 18, 1973), Slip Opinion at 34–35, which is applicable to the instant case:

> To anyone endeavoring with objectivity to consider the contentions of the parties, the most singular impression is of the unending dilemmas which face the school officials of a large urban system. It is altogether too easy for one, desiring in advance a particular result, to assign to any Board action that motive and that effect which most likely will support the personal predilection. Particularly difficult is the necessary task of examining Board action in the light of the circumstances as they existed at a given time, of al-

ternatives available, of knowledge of what the future would or would not bring to the system, and of viewing each action or inaction in the light of its impact on the whole.

## IV. HIGH SCHOOLS

At the present time there are eight senior high schools in the Omaha Public School System. Three of these (Bryan, Burke and Northwest) have been opened within the past seven years and are located in the far south, western and northwestern portions of the School District, respectively. They were built in predominantly white residential areas, and have always had predominantly white enrollments. The remaining five schools, Benson, Central, North, South and Technical, have all been in operation for at least forty years. Three of these five have specified attendance zones—Benson in the mid-northwestern portion of the District; North in the northeastern portion of the District; and South in the southeastern portion of the District. Central and Technical share the same attendance zone in approximately the middle and eastern portion of the District. Technical is north and west of Central and is located approximately at the southern boundary of the Near North Side area which area comprises the largest percentage of black population in the City. In addition to serving this mutual zone, Central and Technical are and have always been open enrollment schools, which means that a student from any attendance zone may choose to attend Central or Technical rather than the high school serving his or her zone. These are the only open enrollment schools.[9]

From 1936 to 1945 Technical High had the largest student body in the School District, enrolling over 3,000 students annually, with a peak of 3,771 in 1940–41. Technical consistently enrolled the largest number of black students

---

9. At one time South was also an open enrollment school, but the evidence does not show that this was ever a significant factor in de-

termining racial enrollments at any Omaha High Schools.

▮

during this time period, with a high of 320, or approximately nine per cent of the student body, in 1941–42.

Around 1945, Technical began experiencing a steady decline in total enrollment to the point that for 1973–74 Technical enrolled only 710 students. At the same time there has been a consistent increase in the percentage of black students at Technical, and in 1973–74, blacks comprised 96 per cent of the student body.

This development has not been paralleled at any other high school. Figures introduced in evidence disclose the following concerning the five schools which have served the School District throughout this time:

| | BENSON | | CENTRAL | | NORTH | | SOUTH | | TECHNICAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Per Cent Black | Total | Per Cent Black | Total | Per Cent Black | Total | Per Cent Black | Total | Per Cent Black |
| 1936–37 | 1,507 | 0[10] | 2,013 | 8 | 2,001 | 2 | 2,803 | 2 | 2,916 | 6 |
| 1941–42 | 1,162 | 0 | 2,113 | 9 | 1,740 | 1 | 2,915 | 2 | 3,365 | 9 |
| 1946–47 | 1,334 | 0 | 1,699 | 12 | 1,515 | 1 | 2,373 | 2 | 2,418 | 10 |
| 1951–52 | 1,186 | 0 | 1,455 | 11 | 1,531 | 1 | 2,183 | 3 | 1,879 | 18 |
| 1956–57 | 1,352 | 0 | 1,882 | 13 | 1,778 | 2 | 2,477 | 3 | 1,727 | 26 |
| 1961–62 | 1,985 | 0 | 1,758 | 13 | 1,794 | 3 | 2,619 | 2 | 1,537 | 44 |
| 1966–67 | 2,096 | 1 | 2,088 | 18 | 2,165 | 18 | 2,521 | 2 | 1,453 | 69 |
| 1971–72 | 1,894 | 7 | 2,078 | 26 | 2,178 | 26 | 2,609 | 2 | 1,048 | 91 |
| 1973–74 | 1,637 | 14 | 2,075 | 32 | 1,890 | 36 | 2,444 | 3 | 710 | 96 |

In the 1950's, published reports of the School District listed Technical as thirty per cent below capacity, Central as filled to capacity, and the three other high schools as overcrowded. In the late 1950's and early 1960's additions at Benson, North and South relieved the overcrowding somewhat at those schools. However, South High experienced severe overcrowding from 1961–62 to 1964–65 and Benson was seriously overcrowded from 1962–63 through 1971–72. Yet, from 1959–60 through 1971–72, Technical, even though it housed Technical Junior High in a wing of the total facility, had excess capacity of from 680 to 1,500 students. This situation as it developed at Technical Senior High was known to the administration of the Omaha Public Schools. Mr. Carl Palmquist, the principal at Technical during the 1950's and 1960's, repeatedly notified the Superintendent of Schools and his staff orally and in writing that Technical was in danger of becoming an all-black school.

▮ It it clear that the success of the open school and mutual zone policies at Technical, insofar as the retention of a sufficiently high enrollment is concerned, were dependent upon the attractiveness of Technical to students throughout the District. It is also clear that in the last twenty-five years, fewer and fewer white students have been attracted to Tech. The plaintiff and intervenors allege that a substantial contributing cause to this situation has been the School District's intentional deterioration of the quality of education offered at Technical. The Court disagrees and finds that the operation of Technical does not disclose segregative intent on the part of the defendants and to the contrary, shows a determination on the part of defendants to upgrade both the physical plant and the quality of education at this school.

▮ Furthermore, as far as Tech's majority black status is concerned, the Court reiterates that racial balance is not required under the Constitution and there can be and are many instances where one-race schools within a District are plainly permissible under the law. It is only where the imbalance is caused by a segregative intent on the part of the School Board and where the imbal-

10. Percentages are rounded to the nearest whole number.

ance thereby reaches the proportion of constitutional violation that the Court may supplant its judgment and policy for that of the School District. As stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1 (1971), at pages 25 and 16, 91 S.Ct. 1267, at pages 1280 and 1276, 28 L.Ed.2d 554:

> The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.

> In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law.

\* \* \* \* \* \*

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion of the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.

*See also,* Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), where the Court stated:

> "The schools . . . are racially imbalanced by reason of N.J.S. 18A: 8–1 to 42 and N.J.S. 18A:38–1 to 24, which sets school district boundaries thereby rendering racial balance mathematically impossible in many districts, thus providing unequal educational opportunities. The State has taken no steps to achieve racial balance by reason of the mathematical composition of the geographical area which comprises the school district, has not attempted to redraw school district lines to achieve racial balance, has not provided funds for compensatory education to overcome adverse educational effects of racial imbalance." *Id.* 326 F.Supp. at 1237.

Plaintiff's substantive claim rests wholly on the assertion that there is an affirmative constitutional duty to achieve racial balance among the several districts of a state system of public schools; and that a failure to do so is in violation of Fourteenth Amendment rights. *Id.* at 1238.

The Court in *Swann* draws a critical distinction between those states which have a history of dual school systems and a separation of the races which has continued through "freedom-of-choice" and "geographical zoning" plans which create the illusion of conforming to law, and those wherein so-called "de-facto" segregation results from housing patterns and conventional drawing of school district zones. *Id.* at 1242.

A continuing trend toward racial imbalance caused by housing patterns within the various school districts is not susceptible to federal judicial intervention. The New Jersey Legislature has by intent maintained a unitary system of public education, albeit that system has degenerated to extreme racial imbalance in some school districts; nevertheless the statutes in question as they are presently constituted are constitutional. *Id.* at 1243.

The evidence discloses that from at least the late 1930's through the 1950's, Technical offered a comprehensive curriculum, with courses in both college preparatory and vocational areas. Tech had the most advanced vocational pro-

gram in the School District, and a sub-stantial portion of the students attend-ing Technical did so because of this pro-gram. Extensive vocational instruction was also offered at South.

In the early 1960's, the interest of high school students in vocational edu-cation diminished District-wide, and greater importance was placed on col-lege preparation. Also, in the 1960's of-ficials at Tech became aware that black students (Technical turned majority black in 1963–64) were having difficulty finding employment in certain skilled areas. As a result of these two factors, Tech dropped its instruction in certain vocational areas, e. g., electronics and instrumentation—and added programs in other vocational areas, such as auto me-chanics and culinary arts, where job ac-cessibility for blacks was greater. The interest of high school students in the vocational programs at Technical has continued to decline to the point that many areas of the school and much equip-ment are not currently in use. The Court does not find, however, that the potential for an excellent vocational edu-cational program at Technical has in any way diminished. The equipment and facilities are present, are of high quality, and are equal to and in some areas supe-rior to, those of any high school in the District. In the 1960's, the curriculum at Tech changed in other ways as well. Certain of the foreign languages (e. g., French and German) were eliminated be-cause of decreased student interest (al-though Spanish and Latin were retain-ed). Also the orchestra was removed. On the other hand, programs such as R. O.T.C., guidance and health (for girls) and an audio-response English program were initiated.

Also, in the early 1960's, a program of what is known as "special education"—i. e., classes geared particularly to stu-dents who have not progressed satisfac-torily academically or who have learning disabilities—was instituted at Tech. Tech was the only high school which had these classes for the first few years, and as many as two hundred students par-ticipated in this program in any one year. Eventually the other high schools initi-ated such classes, although the dates in which they did so are unknown. The plaintiff and intervenors argue that stu-dents from across the District who need-ed special education or who had histories of disciplinary problems in school were channeled into Tech, and that thus, the ability of the Tech students as a whole and the attractiveness as a high school were further reduced. There is not suf-ficient evidence to support this claim. To the contrary, the evidence discloses that the special education program at Technical was designed to serve the stu-dents already enrolled at that school, not students from other schools. Concerning disciplinary problem students, there is evidence that Tech received such students from other schools and transferred such students out of its own facility to other schools, and there is no evidence of the relative numbers of these students.

Prior to the start of the 1971–72 school year, Tech experienced what sev-eral witnesses have described as "disrup-tions" of an unspecified character and number. There is considerable evidence that many students at Technical at this time were dissatisfied with the content and structure of courses offered, the manner of instruction, the treatment of Technical by the central administration of the School District, and the physical plant at Technical. The state of the rec-ord does not permit findings as to the factual basis for this dissatisfaction. However, in response to the students' action, and in cooperation with various citizens' groups and an outside consulting 1971–72. The building itself was repair-firm, the School District made several changes at Tech for the school year ed and renovated; some faculty assign-ments were changed; and the curriculum was altered substantially. The evidence shows that the academic program at Tech from 1971–72 to the present has been basically individualized. The tradi-tional time schedule of quarters, semes-ters, etc., has been discarded so that stu-dents progress at their own pace. Stu-

dents may now take as much or as little of a course as they are able to handle at any one time, and the courses can be structured to fit the particular students' needs. Also Tech has considerable flexibility in its course offerings. Varied faculty backgrounds permit the devising and implementing of courses not formerly offered, as students' needs and interests require. There has also been an active student recruitment program at Technical, both for full and part-time students.

## V. SPECIAL TRANSFER POLICY

### A. Introduction

One of the methods by which a student may attend a school other than that in his zone of residence is by obtaining approval of the School District for a special transfer. The origin of the special transfer policy was explained in the Memorandum Opinion following the preliminary injunction hearing, 367 F.Supp. at 191. Initiated in 1964, the policy has five formal prerequisites for the granting of a special transfer:

1) The achievement level of the pupil requesting a transfer must equal the average level of achievement of the pupils in the grade and school for which the transfer is being requested.

2) The school to which the pupil is transferred cannot be an overcrowded school. Capacities of schools shall be determined by the staff and the Board of Education.

3) The transportation of pupils is totally the responsibility of parents.

4) The request must be a formal written request on an individual basis.

5) Permission for a transfer shall not be granted until enrollments are ascertained.

In addition, in determining whether a transfer should be granted, the School District considers medical reasons, family hardships, and problem or learning situations where the School District feels a student may have a better chance of success in the transferee school.

The plaintiff and intervenors allege that the transfer policy has been operated in such a manner as to permit white students to avoid attendance at neighborhood schools which have substantial numbers of black students, and that this is evidence of the School District's segregative intent. The School District denies that transfers have ever been granted for racial considerations. Plaintiff and intervenors also assert that the transfer policy discriminates against black students because of the transportation and equal achievement requirements, but there has been no evidence introduced at trial which would support such allegations.

The transfer application form used by the School District has no space for indication of race, although correlation with other students records could give the School District this information. The application form does have a space for indication of the reason for transfer. A number of transfer applications have been introduced in evidence on which racial reasons were voluntarily offered by the parents. Some of these requests were granted and some were denied. Other applications have been introduced which list non-racial reasons, and again, some of these were granted and some denied. The Court finds the limited number of individual requests involved to be of little probative value in determining whether the policy as a whole was or was not administered with segregative intent.

Of greater probative value are the extensive analyses of the transfer policy's operation prepared by both the plaintiff and the defendants for the school years 1970–71 and 1971–72. Although both analyses are based upon essentially the same underlying data, the approaches utilized and the portions of the data emphasized by each party are different.

### B. The government's analyses

The plaintiff's analyses classify each transfer approval as segregative, deseg-

regative or of no effect. A transfer is termed segregative if it permits a student to change to a school in which students of his race are in a percentage at least ten per cent greater than that in the school in his zone of residence. If students in his race are in a percentage at least ten per cent less than that in the school in his zone of residence, the transfer is desegregative. If the difference in percentage is within ten per cent, either more or less, the approval has no effect. These analyses and additional evidence of the government are directed toward demonstrating segregative intent through three avenues:

1) The number of segregatory transfers in the School District as a whole;

2) The number of transfers by white students out of predominantly black schools;

3) The number of transfers by white students into overcrowded majority or predominantly white schools.

1) The School District as a whole

Graphs in the government's analyses list transfer approvals for the years 1970–71 and 1971–72 as follows:

1970–71

| | Total | Segregative | Desegregative | No Effect |
|---|---|---|---|---|
| High Schools | 1,024 | 413 | 203 | 408 |
| Junior Highs | 758 | 220 | 198 | 340 |
| Elementary | 1,770 | 608 | 202 | 960 |
| TOTAL | 3,552 | 1,241 | 603 | 1,708 |

1971–72

| | Total | Segregative | Desegregative | No Effect |
|---|---|---|---|---|
| High Schools | 1,015 | 453 | 178 | 384 |
| Junior Highs | 830 | 325 | 174 | 331 |
| Elementary | 2,041 | 733 | 264 | 1,044 |
| TOTAL | 3,886 | 1,511 | 616 | 1,759 |

These totals do not include denials of transfer requests, although this information is available elsewhere in the plain-

tiff's analyses.[11] When denials are included, the totals are:

1970–71

| | Total | Segregative | Desegregative | No Effect |
|---|---|---|---|---|
| High Schools | 1,138 | 423 | 274 | 441 |
| Junior Highs | 925 | 278 | 219 | 428 |
| Elementary | 1,952 | 615 | 285 | 1,052 |
| TOTAL | 4,015 | 1,316 | 778 | 1,921 |
| | | (32.8%) | (19.4%) | (47.8%) |

1971–72

| | Total | Segregative | Desegregative | No Effect |
|---|---|---|---|---|
| High Schools | 1,472 | 484 | 369 | 619 |
| Junior Highs | 1,102 | 411 | 253 | 438 |
| Elementary | 2,177 | 750 | 338 | 1,089 |
| TOTAL | 4,751 | 1,645 | 960 | 2,146 |
| | | (34.6%) | (20.2%) | (45.2%) |

2) Transfers out of predominantly black schools

In its transfer policy analyses, the government includes charts showing the number and race of transfers out of predominantly black schools or zones and the schools to which these transfers were made. Correlation of these charts with other data in evidence permits the following findings:

a) Elementary schools—The predominantly black elementary schools have always been located in a group in the northeastern portion of the School District. In 1970–71 there were 348 white transfers out of these predominantly black elementary schools and the vast majority of these were to nearby majority or predominantly white schools. There were 274 black transfers out of the predominantly black schools and the vast majority of these were to other predominantly black schools. The total number of elementary transfers for 1970–71 throughout the District was 1,770.

In 1971–72 there were 361 white transfers out of the predominantly black elementary schools and again they were principally to nearby majority or predominantly white schools. There were

11. Denials are classified in this way: if the approval would have been segregative, the denial is desegregative; if the approval would have been desegregative, the denial is segregative; if the approval would have had no effect, the denial also has no effect.

274 black transfers out of predominantly black schools and they were principally to other predominantly black schools. The total of the elementary transfers in the District was 2,041.

b) Junior highs—In 1970–71 and 1971–72 there were two predominantly black junior highs—Technical (1970–71 enrollment after transfers: 51 white; 540 black; 1971–72: 48 white, 551 black) and Mann (1970–71 enrollment after transfers: 7 white; 825 black; 1971–72: 16 white, 863 black). Transfers for these years were as follows:

| | Transfers From Tech Zone | | From Technical Zone to Majority or Predominantly White Schools | | Transfers From Mann Zone | | From Mann Zone to Majority or Predominantly White Schools | | District-Wide Total of Junior High Transfers | |
|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | White | Black | White | Black | White | Black | White | Black |
| 1970–71 | 68 | 16 | 68 | 16 | 25 | 144 | 21 | 68 | 497 | 261 |
| 1971–72 | 103 | 22 | 103 | 22 | 42 | 110 | 37 | 63 | 556 | 274 |

c) Senior highs—The only high school which has ever been predominantly (or even majority) black is Technical. As mentioned earlier, Technical shares an attendance zone with Central. In 1970–71 there were 319 white transfers from the Central-Technical zone [12] with 250 of these to South High. There were 158 black transfers out of the Technical-Central zone, chiefly to Central, North and Tech.[13]

In 1971–72, there were 410 white transfers out of the Tech/Central zone, with 315 of these to South. There were 121 black transfers out of this zone, with the majority to North.

### C. The defendants' analyses

As mentioned previously, the transfer policy analyses offered by the School District differ from those of the government in both the approach used and the data emphasized. The material presented in the defendants' analyses can be grouped into three categories:

1) The effect of transfers contributing to racial imbalance on the School District as a whole.

2) The effect of the transfer policy on eighty per cent black schools and on majority white schools.

3) The treatment of transfer requests of both races.

1) The effect on the School District as a whole

The defendant School District classifies all transfers granted for the years 1970–71 and 1971–72 as either contributory or non-contributory to racial imbalance in the schools. All schools are designated by racial enrollment as predominantly white (greater than sixty-

12. This mutual zone presents a problem in attempting to determine just which transfers were actually from Tech and which were from Central. In its analyses of this point, the government *included all* transfer requests where the zone of residence was listed as Technical, Central, or Technical/Central. The defendants' analyses of transfers from the eighty per cent black schools (which would include Tech) *excluded all* transfers from the Central/Tech zone. Thus, neither set of analyses presents a truly accurate picture of the students who transferred from the Technical/Central zone and who otherwise would have attended Tech.

13. Thus, some black students switched from Tech to Central and vice versa. Central in 1970–71 was twenty-five per cent black and in 1971–72 was twenty-six per cent black.

314

five per cent white), majority white (greater than fifty per cent white, and hence minority black), majority black (greater than fifty per cent black and hence minority white), or predominantly black (greater than sixty-five per cent black). All transfers by a student to a school in which his race is in a more concentrated designation (e. g., a white student transferring from a majority white school to a predominantly white school) are termed contributory. All transfers by a student to a school in which his race is in a concentration of the same designation or in a less concentrated designation (e. g., a black student transferring from a majority black school to another majority black school, or to a majority white school) are termed noncontributory. Denials of requested transfers are not included by the defendants in their analyses. The totals for the two years in question are:

| | 1970–71 | | 1971–72 | |
|---|---|---|---|---|
| | Contributory | Non-Contributory | Contributory | Non-Contributory |
| White | 494 | 1,824 | 647 | 2,146 |
| Black | 108 | 752 | 116 | 782 |
| TOTAL | 602 | 2,576 | 763 | 2,928 |
| | (18.94%) | (81.05%)[14] | (20.67%) | (79.32%) |

2) The effect on eighty per cent black schools and majority white schools

A second phase of the School District's analyses focuses on the net effect of the transfer policy on the black enrollments at certain schools. The first group of schools lists those in which the total enrollment was eighty per cent or more black:

| Schools | 1970–71 | | | 1971–72 | | |
|---|---|---|---|---|---|---|
| | Blacks Before | Blacks After | Net Result | Blacks Before | Blacks After | Net Result |
| Tech. Sr. | 991 | 1,013 | 22 | 966 | 951 | −15 |
| Mann Jr. | 992 | 825 | −167 | 980 | 863 | −117 |
| Tech Jr. | 483 | 540 | 57 | 525 | 551 | 26 |
| Conestoga | 326 | 341 | 15 | 389 | 400 | 11 |
| Druid Hill | 410 | 424 | 14 | 385 | 397 | 12 |
| Fairfax | 64 | 64 | 0 | 62 | 63 | 1 |
| Franklin | 937 | 906 | −31 | 905 | 866 | −39 |
| Kellom | 643 | 659 | 16 | 617 | 621 | 4 |
| Kennedy | 698 | 733 | 35 | 667 | 662 | −5 |
| Lake | 279 | 279 | 0 | 250 | 257 | 7 |
| Long | 188 | 184 | −4 | --[15] | -- | -- |
| Lothrop | 937 | 922 | −15 | 849 | 836 | −13 |
| Saratoga | 701 | 692 | −9 | 639 | 639 | 0 |
| TOTAL | 7,649 | 7,582 | −67 | 7,234 | 7,106 | −128 |

Per cent of all black students in School District:

| | 64.91% | 64.33% | −.58% | 59.93% | 58.86% | −1.07% |

The second group of schools includes those schools in which the total enrollment was fifty per cent or more white. Totals for the eighty-three such schools in 1970–71 and eighty-six in 1971–72 are as follows:

| | Blacks Before | Blacks After | Net Result |
|---|---|---|---|
| 1970–71 | 2,947 (25.0%)[16] | 3,145 (26.7%) | +198 (1.7%) |
| 1971–72 | 3,675 (30.4%) | 3,918 (32.5%) | +243 (2.0%) |

14. Although the underlying data for both the government's and the defendants' analyses are essentially the same, comparison of the above figures with those reached by the government for transfer approvals shows that the defendants' totals are noticeably smaller. The discrepancy is no doubt due in large measure to the School District's omission from its analyses of any transfers in which the student's pre-transfer school or zone of residence was listed on the request as a combination zone (e. g., Central-Tech, or an optional zone, e. g.,

15, 16. See notes 15 & 16 on page 315.

3) Treatment of all transfer requests

The third phase of the evidence offered by the defendants is a comparison of the treatment of black and white transfer requests. This evidence shows the following:

| | 1970–71 | | 1971–72 | |
|---|---|---|---|---|
| | Number | Per Cent | Number | Per Cent |
| Total Requests by Whites | 3,008 | | 3,680 | |
| Approvals | 2,638 | 87 [17] | 2,978 | 80 |
| Denials | 370 | 12 | 702 | 19 |
| Total Requests by Blacks | 1,033 | | 1,138 | |
| Approvals | 910 | 88 | 942 | 82 |
| Denials | 123 | 11 | 196 | 17 |

The School District also points out that under the plaintiff's analyses for 1970–71, 88.3 per cent of all white transfer requests were granted, along with 88.9 per cent of all black requests. For 1971–72, 81.3 per cent of all white transfer requests were granted, along with 83.1 per cent of all black transfer requests.

D. Conclusion

Based upon all the exhibits and testimony received in this case, the Court reaches the following conclusions concerning the defendants' special transfer policy:

■ 1) The operation of a special transfer policy is not per se evidence of segregative intent. There are many legitimate ends which such a policy may serve. Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965). It is, however, a deviation from the announced neighborhood school policy and thereby is subject to close scrutiny.

2) The race of the applicants has not been a factor in the School District's determination to grant or deny special transfers. Requests by black students have been granted with at least the same frequency as those of white students.

3) The segregative effect of the transfer policy on the School District as a whole is slight. Under the plaintiff's analyses, 1,316 transfer actions in 1970–71 and 1,645 in 1971–72 were segregative. Yet there were over 63,000 students in the Omaha Public Schools for those years, and the segregative transfer actions, therefore, dealt with approximately 2.1 per cent and 2.6 per cent of the total students enrollments, respectively. If the numbers of approved transfers contributory to racial imbalance under the defendants' analyses are used, the percentages are even smaller.

4) The effect of the transfer policy on the predominantly black schools is of greater consequence. The defendants' exhibits shows that the black enrollments at eighty per cent black schools (Why the defendants have chosen eighty per cent is unclear; the figure sixty-five per cent, representing "predominantly" black schools has been used throughout the litigation by all parties.) has decreased slightly after implementation of the transfer policy. It is equally clear that the white enrollments at these schools and all predominantly black schools have decreased as a result of the policy.

■ The bare facts remain, however, that the special transfers under the policy in question were not granted upon any basis of racial conditions or considerations, and there is no question but what these transfers have been granted with the same frequency to black students as to white students. Further, the achievement level requirement applies equally to both black students and white students. Thus, the open transfer policy in question clearly meets constitutional tests heretofore handed down repeatedly by other courts. There is no pronouncement on the precise question by the United States Supreme Court, but

Morris-Lewis and Clark, Lewis and Clark-Morris-Tech Junior High, Hale-Morton). See footnte 12, *supra*.

15. Long was closed following the 1970–71 school year.

16. Percentage of all black students in the District.

17. Percentages are not carried out to decimal places.

approval here would clearly be indicated by that Court in its opinion in Goss v. Board of Education of City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963) wherein Justice Clark writing for a unanimous Court stated at page 688, 83 S.Ct. at page 1409:

> This is not to say that appropriate transfer provisions, upon the parents' request, consistent with sound school administration and not based upon any state-imposed racial conditions, would fall. Likewise, we would have a different case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein.

In Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310 (4th Cir. 1965), vacated on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), a case involving a transfer policy substantially similar to the transfer policy in question, the Court stated, 345 F.2d at page 316, in approving the transfer system:

> It has been held again and again, however, that the Fourteenth Amendment prohibition is not against segregation as such. The proscription is against discrimination. Everyone of every race has a right to be free of discrimination by the state by reason of his race. There is nothing in the Constitution which prevents his voluntary association with others of his race or which would strike down any state law which permits such association. The present suggestion that a Negro's right to be free from discrimination requires that the state deprive him of his volition is incongruous.
>
> The phrase from the second Brown decision to which the plaintiffs refer lends no support to their contention. The first paragraph of the opinion, in which the phrase appears, clearly and precisely expresses the proscription against "discrimination." There is no hint of a suggestion of a constitutional requirement that a state must

forbid voluntary associations or limit an individual's freedom of choice except to the extent that each individual's freedom of choice may be affected by the equal right of others. A state or a school district offends no constitutional requirement when it grants to all students uniformly an unrestricted freedom of choice as to schools attended, so that each pupil, in effect, assigns himself to the school he wishes to attend.

This and other courts have repeatedly referred to the legality and propriety of a system of free transfers.

We first did so in Dillard v. School Board of City of Charlottesville, 4 Cir., 308 F.2d 920, 923–924. In an opinion previously prepared by Senior Judge Soper, subsequently adopted per curiam as the opinion of the en banc court, there was approving reference to systems of unrestricted rights of transfer, which were said to have been conspicuously successful in Baltimore and in Louisville. Subsequently, in Jeffers v. Whitley, 4 Cir., 309 F.2d 621, while condemning a compulsive system sought to be justified on the basis of assertions of volition of the pupils, we indicated en banc our approval of a truly voluntary system under which at reasonable intervals reasonable alternatives were available to all pupils, so that those who wished to do so might attend a school with members of the other race. Finally, when this case was before us earlier, this Court, anticipating the School Board's implementation of a system of free assignments and transfers, indicated its appropriateness, provided pupils, parents and the public in general were all informed of it. We there said in summary: (Footnote omitted.)

" * * * As we clearly stated in Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962), the appellants are not entitled to an order requiring the defendants to effect *a general inter-mixture of the races in the schools* but they are entitled to an order enjoining the de-

fendants from refusing admission to any school of any pupil *because of the pupil's race.* The order should prohibit the defendants' conditioning the grant of a requested transfer upon the applicant's submission to futile, burdensome or discriminatory administrative procedures. If there is to be an absolute abandonment of the dual attendance area and 'feeder' system, if initial assignments are to be on a nondiscriminatory and voluntary basis, and if there is to be a right of free choice at reasonable intervals thereafter, consistent with proper administrative procedures as may be determined by the defendants with the approval of the District Court, the pupils, their parents and the public generally should be so informed." (Emphasis in original.)

*See also,* Taylor v. Board of Education of City School District of New Rochelle, 294 F.2d 36 (2d Cir. 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339; Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S. Ct. 1223, 12 L.Ed.2d 216 (1964).

In conclusion, the Court finds that the transfer policy of the defendants is constitutionally permissible, is not violative of the Constitution and was neither conceived nor maintained with a segregative intent.

## VI. HIRING AND ASSIGNMENT OF BLACK FACULTY AND STAFF

██ The plaintiff and intervenors allege that the segregative intent of the defendants is also evident from the School District's policies concerning the hiring and placement of teaching faculty and staff.

In 1940–41 the first two black teachers were employed by the defendant School District and were assigned to Long Elementary School (predominantly black). The School District at this time had over 2,000 black students. By 1973–74 there were 227 black teachers and over 12,000 black students in the Omaha Public Schools. From 1940–41 through 1958–59, all of the black teachers employed by the School District were assigned to elementary schools and all of these schools were majority black. No black teachers were assigned to majority white schools until 1962–63.

The first black teachers were assigned to a junior high in 1959–60 when Horace Mann Junior High was opened (1959–60 enrollment: 71 per cent black). Seven of the twenty-three teachers assigned to Mann were black. Black teachers were first assigned to a majority white junior high in 1964–65. Between 1959–60 and 1971–72 (when Technical Junior High was closed) the large majority of black junior high faculty were assigned to majority black junior highs (*i. e.*, Mann or Tech), although only once did black teachers comprise a majority of the faculty at either of these schools.

Black faculty members first taught in the senior high schools in 1963–64, when two were assigned to Technical Senior High (51 per cent black) and one to North (9 per cent black).

The plaintiff and intervenors have also offered the testimony of six black persons who at some time were employed in the Omaha Public Schools, but whose treatment by the defendant School District with respect to hiring and placement is alleged to have been racially discriminatory. Three of these black people are currently employed by the School District, one as an assistant superintendent, one as a junior high principal, and one as a senior high assistant principal. The other three are no longer with the school system. The experiences of a white assistant superintendent concerning his hiring and placement by the School District have been offered by the defendants, as well as other documentary evidence. From this material and that in the preceding paragraphs, the Court makes the following findings:

1) Through the early 1960's a very small number of black teachers was employed by the School District in compar-

ison to the number of black persons enrolled as students. However, there is little evidence of any kind concerning the availability of black teachers during this time period, and what little evidence there is would indicate that there were few qualified black teachers to be hired. The evidence does show that in the 1950's and early 1960's teachers of both races were employed by the School District even though they did not have the proper state certification. There is insufficient evidence to show an intentionally racially discriminatory policy of the School District with respect to *hiring* for any time period.

2) There is evidence which demonstrates that through the early 1960's the School District had a policy of placing black faculty members solely in schools with majority black enrollments.

3) There is evidence which demonstrates that through the early 1960's, the School District refused to place qualified black secondary teachers at the secondary level. These people were employed but placed at the elementary level. The number of black teachers so treated was small, and this same situation was also applicable to some white teachers for certain years. However, there was no pattern shown for white teachers as there was for black teachers.

In 1963 the School District began an active recruitment program for minority personnel. Extensive trips were made by principals and other representatives of the School District to several states for the purpose of visiting college campuses with substantial numbers of black students. These representatives explained the Omaha Public School System to minority college students and encouraged applications. The schools visited have been primarily black colleges and universities in the southern and western United States. The success of recruitment has been periodically re-evaluated and new schools have been added to the list if those previously visited have not produced a sufficient number of applications. The following chart deals with the hiring of black faculty since the institution of this recruitment program:

| | Total Black Faculty in District | Black Teachers at Majority Black Schools | Black Faculty as Per Cent of Total Faculty | Black Supervisory and Administrative Personnel |
|---|---|---|---|---|
| 1963–64 | 76 | 72 | 4.1 | 3 |
| 1964–65 | 104 | 92 | 5.2 | 5 |
| 1965–66 | 105 | 94 | 5.1 | 13 |
| 1966–67 | 123 | 109 | 5.8 | 15 |
| 1967–68 | 136 | 116 | 6.1 | 12 |
| 1968–69 | 160 | 139 | 6.9 | 18 |
| 1969–70 | 164 | 128 | 6.8 | 22 |
| 1970–71 | 186 | 137 | 7.5 | 25 |
| 1971–72 | 186 | 149 | 7.0 | 38 |
| 1972–73 | 214 | 121 | 7.7 | 42 |
| 1973–74 | 227 | unavailable | 8.0 | 41 |

From 1964–65 through 1972–73, 47.5 per cent of all certificated (*i. e.,* those possessing appropriate Nebraska teaching certificates) black applicants were offered teaching contracts, and 37 per cent were hired. Some 10.5 per cent did not accept the contracts. For the same time period, 25.1 per cent of all white certificated applicants were hired (no statistics were kept on the percentage of white applicants offered contracts but who rejected them during 1964–69). During 1969–70 through 1972–73, 50.6 per cent of all certificated black applicants were offered teaching contracts, and 39.9 per cent were hired. For the same period, 24 per cent of all certificated white applicants were offered contracts and 19 per cent were hired.

CONCLUSION

The Court concludes that the School District has never had a policy of discriminating against black teachers in hiring. The School District did, from approximately 1940 through the early 1960's, have a policy of placing black teachers in majority black schools only, and also had a policy of confining qualified black secondary teachers to the elementary grades. However, these placement policies were discarded in approximately 1963 and the Court concludes from all the evidence that substantial progress has been made in eradicating the effects of these policies. This has

been due in large measure to affirmative action taken by the School District not only as to placement but also as to hiring.

There is also some evidence that in evaluating the effectiveness of teachers preparatory to assigning them to schools, the School District felt that black teachers would have greater success than white teachers in working with black students. Also, there is some evidence that the School District felt that having successful black role models was important for black children, and particularly with regard to male teachers at the elementary level. Whatever may be the relative merits of this theory, and the Court intimates no opinion on this point, the Court finds that the School District held this belief in good faith, and that this fact is entitled to some weight in any ultimate conclusion regarding segregative intent on the part of the School District.[18]

## VII. GENERAL CONSTRUCTION

■ The plaintiff and intervenors argue that segregative intent can also be inferred from an examination of the School District's new school construction program. This includes construction of Martin Luther King Middle School, the motives for construction of which were probed extensively at the preliminary injunction hearing, 367 F.Supp. at 183, et seq.

There is no claim that the defendants have operated rundown or physically inferior buildings for the schools with substantially black enrollments. The argument, rather, is that the School District has constructed new schools knowing that the racial composition at these schools would be either predominantly black or predominantly white and that, therefore,

the School District acted with segregative intent in building these schools.

The evidence shows that from 1951 through 1973, thirty-nine new school buildings or additions were erected by the School District, of which thirty-seven opened with predominantly white or predominantly black enrollments. Twenty-one of these buildings or additions were constructed from 1964 through 1973, and all of them opened predominantly white or black. Certainly School District officials did know or should be charged with knowing, the racial compositions at these schools. But to say that the School District, therefore, acted with segregative intent simply does not follow and cannot be stated.

Of the thirty-nine new schools opened since 1951, twenty-one were built in predominantly white residential areas added to the School District since 1955. There either were no schools available in these areas or the existing schools were inadequate to serve the neighborhood. The remaining eighteen were constructed throughout the area served by the School District in 1955, in residential areas substantially white, substantially black and mixed. The evidence does not disclose any sort of pattern of concentrating new schools in black neighborhoods or neighborhoods changing from white to black. In short, there simply was no pattern of "containment" as charged by the plaintiff and intervenors. New schools and additions were placed either as a means of coping with increased enrollments or as replacements for older, inadequate facilities.

■ It is undoubtedly true that many of these new schools could have opened with substantially less polarized racial enrollments if the School District

18. If this theory is in fact erroneous educationally speaking, the School District was not the only entity in the community in error. One of the criticisms of the Omaha Ministerial Alliance (a group of black religious leaders in the Omaha-Council Bluffs area) concerning Technical High in 1972 was that while the black-white student ratio was 91.5–

8.5, the teacher ratio was 14.6–85.4. The criticism was that the Tech students were thus deprived of persons who could understand their heritage and relate to them satisfactorily. One of the Alliance's recommendations was that the faculty at both Technical Senior and Technical Junior High be at least 60 per cent black.

had taken affirmative action in that regard—*e. g.*, by changing attendance boundaries, exchanging grades between different schools, or mass transportation. But absent any segregative pattern, the Court finds the placement of new schools and additions to be entirely consistent with the defendants' neighborhood school policy. Therefore, the failure of the defendants to take such affirmative action is not evidence of segregative intent.

## VIII. HOUSING

There has been considerable evidence introduced by the intervenors for the purpose of proving the existence of residential segregation in the City of Omaha over the past three decades, and of establishing some basis upon which the defendant School District can be held responsible for this situation. This evidence has generally fallen into two categories:

1) Involvement of the Omaha Public Schools with the housing situation;

2) Discriminatory practices attributable to city, state and federal agencies or governments.

### 1) Involvement of the Omaha Public School System

The evidence in this category has been introduced for the purpose of proving four propositions:

a) That there is substantial residential segregation in the City of Omaha, especially in its newer subdivisions.

b) That this segregation has been caused to a substantial degree by segregatory practices of real estate companies —*e. g.*, through restrictive covenants, restricted home listings, and the exclusion of blacks from employment in the real estate industry.

c) That the defendant School District has consulted with real estate companies concerning the location of schools and proposed subdivisions.

d) That this consultation constituted substantial involvement in the development of segregated subdivisions, which is evidence of the School District's general segregative intent.

The Court assumes, without deciding, the validity of point (a). Because of the Court's findings with respect to points (c) and (d), none are required concerning point (b), and the Court hesitates to venture unnecessarily into an area in which the principal persons involved (the realtors) have had no opportunity to present evidence in their behalf.

The Court does find that the School District has, from approximately 1950 to the present, consulted with real estate companies concerning the location of schools in residential subdivisions. The evidence also shows that at least one prominent realty company has given some school land to the District outright, and has sold and continues to sell other school land to the District at the company's cost. The evidence is clear that this company has had no input concerning the size or racial composition of any such school.

The Court does not, however, find that this constitutes such a level of involvement with subdivision development as to make the School District responsible for any segregation which may have occurred. School District officials, to properly perform their duties, must be aware of areas of residential development and the possibility of annexation of new subdivisions to the District. It is, therefore, only prudent for these officials to consult with developers concerning the providing of school services for these areas. This prudence is both logistical, in terms of the most desirable location of school facilities, and fiscal, in terms of acquiring sites at the lowest possible cost. There is no indication whatsoever that the School District desired, encouraged, or promoted any residential segregation. Further, there is no evidence that the racial composition of these subdivisions was ever discussed or considered by School District officials in any consultations with real estate companies.

### 2) Other governmental activity

The intervenors have also introduced evidence for the purpose of showing that

acts and practices of certain bodies in various levels of government have contributed to a segregated residential condition in the School District, for which, through application of its neighborhood school policy, the School District must now be held responsible. This evidence concerned the location of family-occupied public housing projects by the Omaha Housing Authority (an agency of the City of Omaha) and the placement of families by race within those projects from 1938 to the mid-1950's; legislation passed by the State of Nebraska in 1965 which prohibited real estate brokers or salesmen from refusing to show, sell, rent or lease property on the basis of race unless the owner so specified; judicial enforcement of restrictive covenants by the State of Nebraska prior to 1948; and policies of the Federal Housing Administration in the 1930's concerning the underwriting of home mortgages where the sales would introduce "inharmonious" racial or nationality groups.

 The intervenors' theory with respect to this evidence is not that the School District's failure to prevent these policies and practices is evidence of segregative intent, but that since these are governmental bodies and agencies, their conduct constitutes state action for which the School District must now provide some remedy. The Court is aware that this theory has been adopted by some courts, Hart v. Community School Board of Brooklyn, New York School District No. 21, 383 F.Supp. 699 (E.D.N.Y., 1974); Oliver v. Kalamazoo Board of Education, 368 F.Supp. 143 (W.D.Mich. 1973). However, assuming the validity of this theory, upon which the Court does not pass, the Court simply does not agree that the evidence introduced herein is of a character sufficient to show state action as the substantial cause of racial imbalance in the Omaha Public Schools. The evidence introduced on this point consists entirely of isolated incidents or practices, most of which took place from two to four decades ago. Compare the substantial governmental activity related in *Hart* and *Oliver*, *su-*

*pra.* This Court simply does not feel that the incidents and practices introduced in evidence are of sufficient probative value to permit the Court to conclude that the individual or combined actions of the city, state and federal governments have been a substantial factor in causing purported current residential segregation within the School District.

## CONCLUSION

 As stated previously, this litigation has been focused upon the second requirement in *Keyes*, namely, whether the current racial imbalance in the Omaha School System was intentionally caused or maintained by the defendants. Further, as is apparent, we are dealing with a school system which has developed on the neighborhood plan and which has traditionally been so maintained. We are not confronted here with a dual system, operated either statutorily or constitutionally, but rather with an historic unitary system based upon a neighborhood school plan. There can be no doubt that such a plan, if administered without an intentionally segregative policy practiced in a meaningful or significant portion of the system, is constitutionally valid regardless of some resulting degree of racial imbalance. In Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), the Court stated at page 60:

Appellants, however, pose the question of whether the neighborhood system of pupil placement, fairly administered without racial bias, comports with the requirements of equal opportunity if it nevertheless results in a creation of schools with predominantly or even exclusively Negro pupils. The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation

needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication.

Justice Powell, in *Keyes*, 413 U.S. at page 246, 93 S.Ct. at page 2716, stated that the legitimacy of the neighborhood concept rests on even more basic grounds:

> Neighborhood school systems, neutrally administered, reflect the deeply felt desire of citizens for a sense of community in their public education. Public schools have been a traditional source of strength to our Nation, and that strength may derive in part from the identification of many schools with the personal features of the surrounding neighborhood. Community support, interest, and dedication to public schools may well run higher with a neighborhood attendance pattern: distance may encourage disinterest. Many citizens sense today a decline in the intimacy of our institutions—home, church, and school—which has caused a concomitant decline in the unity and communal spirit of our people. I pass no judgment on this viewpoint, but I do believe that this Court should be wary of compelling in the name of constitutional law what may seem to many a dissolution in the traditional, more personal fabric of their public schools.

\*　　\*　　\*　　\*　　\*　　\*

In the commendable national concern for alleviating public school segregation, courts may have overlooked the fact that the rights and interests of children affected by a desegregation program also are entitled to consideration. Any child, white or black, who is compelled to leave his neighborhood and spend a significant time each day being transported to a distant school suffers an impairment of his liberty and his privacy. Not long ago, James B. Conant wrote that "(a)t the elementary school level the issue seems clear. To send young children day after day to distant schools [by bus] seems out of the question." A commu-

nity may well conclude that the portion of a child's day spent on a bus might be used more creatively in a classroom, playground, or in some other extracurricular school activity. Decisions such as these, affecting the quality of a child's daily life, should not lightly be held constitutionally errant. (Footnote omitted.)

This Court has made a careful and painstaking review of the record and excellent briefs before it and has carefully considered the arguments and theories of all parties to this litigation, as advanced by competent and well-qualified counsel. From all the evidence before it, and from reviewing the many cases dealing with the segregation problem, this Court is convinced that this record simply does not justify the finding and determination that the school authorities in question intentionally discriminated against minority students by practicing a deliberate policy of racial segregation. Without such a finding, the law does not require that a school system developed on the neighborhood plan, honestly and conscientiously framed and administered, without intention or purpose to discriminate racially, must be set aside or abandoned because a racial imbalance in certain schools sometimes is the result. *See Bell, supra.*

This Court has no authority, nor any directive, to substitute its opinion for what would constitute a good policy or better policy for that of the School Board unless the policy in question is violative of the Constitution. As stated in Davis v. School District of Pontiac, 474 F.2d 46, 48 (6th Cir. 1973) (Kent, J., dissenting):

> (T)here is no authority in a court of equity to impose upon parties to the action remedies which the trial judge may *think* would be a good policy. Policy is for the school authorities, except as and unless such policy creates a condition which offends the Constitution.

This Court does not claim to have all the answers to the problems of racial imbalance within some of the public schools in our community or in our state or in

our nation. But the Court would observe that the many different answers and proposed remedies are best left to the sound judgment and discretion of the appropriate officials and the citizens in the communities involved, with the provision, of course, that such judgments and discretion be exercised within the framework of the Fourteenth Amendment and without discrimination based upon race, creed, religion or color.

Therefore, in accordance with this Memorandum Opinion, an order will be entered this day dismissing the complaints of the plaintiff and intervenors herein.