**UNITED STATES of America,
Plaintiff-Appellant,**

and

**Nellie Mae Webb et al.,
Plaintiffs-Intervenors-Appellants,**

v.

**SCHOOL DISTRICT OF OMAHA et
al., Defendants-Appellees.**

Nos. 74–1964, 74–1993.

United States Court of Appeals,
Eighth Circuit.

Submitted April 17, 1975.

Decided June 12, 1975.

Rehearings and Rehearings Denied
July 7, 1975.

Certiorari Denied Nov. 11, 1975.
See 96 S.Ct. 361.

Brian K. Landsberg, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Robert V. Broom, Legal Aid Society, Omaha, Neb., for intervenor Webb.

Gerald P. Laughlin, Omaha, Neb., for defendants-appellants.

Before JONES, Senior Circuit Judge,* and HEANEY and BRIGHT, Circuit Judges.

HEANEY, Circuit Judge.

The issue presented by this appeal is whether the undisputed racial segregation which exists in the Omaha public schools denies to black students the equal protection of the laws guaranteed by the fourteenth amendment. Because segregated educational facilities were never mandated by law, it is conceded that a finding of unconstitutionality is dependent on a finding that the segregation was brought about or maintained by intentional state action. We conclude that sufficient evidence was presented to

* Warren L. Jones, Senior Circuit Judge, Fifth Circuit, sitting by designation.

establish that segregation in the Omaha School District [1] was intentionally created and maintained by the defendants.[2] Accordingly, we require that the Omaha School District be integrated, establish guidelines for achieving that goal, and remand to the District Court to supervise the process.

## I. THE SEGREGATED NATURE OF THE SCHOOL DISTRICT.

The Omaha public schools are segregated. The District Court so found, and the defendants do not contest that finding. Nevertheless, we briefly describe the segregated nature of the schools. In 1973–74, the School District of Omaha had a student population of 60,502, of whom 20% were black. It operated eight high schools, twelve junior highs, one middle school (grades 5–7), and seventy-eight elementary schools. Over 50% of the black students in the District attended schools which had an 80% to 100% black enrollment,[3] while 73% of the white students attended schools with black enrollments of less than 5%.

At the high school level, Tech was 96% black, and shared a common attendance zone with Central, which was 32% black. North was 36% black, Benson was 14% black, and South was 3% black. The remaining three high schools enrolled less than fifteen black students.

At the junior high level, Horace Mann was 97% black, Monroe was 39% black, McMillan was 36% black, Indian Hill was 19% black, Hale was 10% black, and

Lewis and Clark was 5% black.[4] The six remaining junior high schools had enrollments of less than 3% black. One middle school, Martin Luther King, opened in September, 1973, with an 82% black enrollment.

At the elementary level, three schools (Kennedy, Lothrop, and Conestoga) were over 90% black. An additional seven were between 75% and 90% black, two were between 50% and 75% black, two were between 35% and 50% black, ten were between 10% and 35% black, three were between 5% and 10% black, and eighteen were between 1% and 5% black. Thirty-three elementary schools were either all white or had less than 1% black enrollment.

The faculties were also segregated. In 1972–73, the latest year for which figures were provided in the record, the District employed 193 black teachers. Of that number, 121 or 62% were assigned to majority black schools,[5] and 159 or 82% were assigned to the twenty-three schools which had a black enrollment exceeding 25%. Thus, only 18% of the black teachers were assigned to the seventy-five schools with enrollments less than 25% black.

At the high school level, 23 of the 49 black teachers were assigned to Tech (95% black), and 44 black teachers (90% of the total) were assigned to the three high schools with more than 30% black enrollment: Tech, Central and North. Only five black high school teachers were assigned to the five remaining high

1. The District embraces most of the City of Omaha and part of Sarpy County, Nebraska.

2. The defendants are the School District of Omaha [District], the Superintendent of Schools for the District, and the twelve members of the Board of Education for the District.

3. The following chart represents the number of black students who attended schools which were 35% or more black in 1973–74:

| | Total Black Enrollment | Black Enrollment in Schools 35% or more Black |
|---|---|---|
| Elementary Schools | 6,876 | 5,638 |
| Junior High Schools | 2,634 | 2,291 |
| High Schools | 2,452 | 1,355 |
| | 11,962 | 9,284 |

4. Tech Junior High was 91% black in its final year of operation, 1971–72.

5. Hereinafter, we use the following terms used by the parties and the District Court: "Majority" white or black means that the enrollment at a given school is at least 50% of the designated race. "Predominantly" white or black means that the enrollment is at least 65% of the designated race.

schools, and two of those were assigned to Benson, which was 10% black. One high school, Northwest, had no black teachers.

At the junior high level, 18 or the 38 black teachers were assigned to Mann (98% black), and 28 black teachers (74% of the total) were assigned to the three junior high schools with more than 30% black enrollment: Mann, McMillan and Monroe. The ten remaining black teachers were assigned to five junior high schools. Four junior high schools had no black teachers.

At the elementary level, 79 of the 106 black teachers (or 75%) were assigned to ten schools with black enrollments of over 75%, and 86 black teachers (81% of the total) were assigned to the sixteen elementary schools with black enrollments exceeding 25%. The remaining 20 black elementary teachers were sprinkled over the sixty-two schools with less than 25% black enrollment. Lothrop elementary (96% black) had more black elementary teachers than those sixty-two schools combined. At least forty-six elementary schools with predominantly white enrollments did not have a single black faculty member.

No discussion of the segregated nature of the Omaha public schools would be complete without mention of the segregated housing patterns in the city and some of the reasons therefor. The area in which most of the black community resides is commonly referred to as the "Near North Side." The area encompassed by that term has changed as blacks have spread out from the core area, particularly toward the northwest. Newly developing residential areas on the periphery of the city, as well as older residential areas beyond the Near North

Side's "encroachment pattern," remain almost exclusively white.

The evidence established that segregated housing patterns in the city were the result of discriminatory state and private actions. Between 1938 and 1953, the Omaha Housing Authority opened five large family-occupied public housing projects. Four were constructed in, or adjacent to, the Near North Side, and each was over 95% black in 1973. One was located in South Omaha, and became a "white project." The Housing Authority encouraged racially discriminatory housing assignment by allowing white applicants for public housing to turn down openings in "black" projects while remaining at the top of the priority list. Compare Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969). By 1955, the school board was aware of the segregated nature of the housing projects and was struggling to cope with large increases in black enrollment causing overcrowding at Druid Hill, Kennedy, Kellom, Lake, and Lothrop elementary schools.[6]

Private racial discrimination in the housing market was also prevalent. It was common for racial covenants to be included in deeds even after Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). In 1953, the Code of Ethics discouraged realtors from selling property to blacks in a white neighborhood. In the late 1960's sellers were given an option by the realtors to cross out a sentence barring discrimination in listing agreements. And, at least from 1965 through 1968, it was common practice to put the word "CONDITIONS" on any multiple listing where the seller had indicated that he did not wish to sell the property to minorities. Approximately

6. An early school report published in 1951 recognized that

 * * * There is a tendency toward the restriction of the residence of Negroes, which has caused a certain amount of geographical segregation. * * *

That report also stated:

 * * * Segregation, even though it is a result of residence rather than administration, is most undesirable educationally. Certainly it is a factor which must be taken into consideration in the redistricting of the elementary schools and in the location of new school structures.

Later reports by and large ignored racial segregation in the schools.

one-third to one-half of multiple listing cards during that period had this notation.

## II. THE LEGAL STANDARD GOVERNING PROOF OF UNCONSTITUTIONAL SCHOOL SEGREGATION.

■■■ Although *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), dealt only with a school system in which segregation was mandated by law, it has since been made clear in a series of "northern and western" cases[7] that no intentionally segregated school system can be tolerated under the Constitution. It is equally clear that the "intent" which triggers a finding of unconstitutionality is not an intent to harm black students, but simply an intent to bring about or maintain segregated schools. Thus, even if a school board believes that "separate but equal" is superior for black children, that belief will not save the intentional segregation from a finding of unconstitutionality. "Benevolence of motives does not excuse segregative acts." *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182–183 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). *See also Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21,* 512 F.2d 37, 50 (2nd Cir. 1975).

Since segregation in the Omaha public schools was obvious at the time of trial, the only question presented to the District Court was whether or not the defendants intended to bring about or maintain that condition. The District Court properly recognized that segregative intent usually must be inferred. It held, however, that the burden of proving such intent rested at all times on the appellants, and concluded that the appellants had failed to meet that burden, despite its findings that various acts and omissions of the defendants had the natural, probable, foreseeable and actual consequence of creating and maintaining segregation.[8]

■■■ We hold that a presumption of segregative intent arises once it is established that school authorities have en-

---

7. *See, e. g., Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Detroit); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Denver); *Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21,* 512 F.2d 37 (2nd Cir. 1975) (New York City); *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) (Boston); *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) (Kalamazoo); *Berry v. School Dist. of City of Benton Harbor, Mich.,* 505 F.2d 238 (6th Cir. 1974); *Brinkman v. Gilligan,* 503 F.2d 684 (6th Cir. 1974) (Dayton); *Johnson v. San Francisco Unified School District,* 500 F.2d 349 (9th Cir. 1974); *Soria v. Oxnard School District Board of Trustees,* 488 F.2d 579 (9th Cir. 1973), *cert. denied,* 416 U.S. 951–952, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974); *United States v. Board of Sch. Com'rs of Indianapolis, Ind.,* 474 F.2d 81 (7th Cir.), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); *Kelly v. Guinn,* 456 F.2d 100 (9th Cir. 1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973) (Las Vegas); *Davis v. School Dis-* trict of City of Pontiac, Inc., 443 F.2d 573 (6th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *United States v. School District 151 of Cook County, Ill.,* 432 F.2d 1147 (7th Cir. 1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); *Taylor v. Board of Ed. of City Sch. Dist of New Rochelle,* 294 F.2d 36 (2nd Cir.), *cert. denied,* 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); *Clemons v. Board of Education of Hillsboro,* 228 F.2d 853 (6th Cir.), *cert. denied,* 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956); *Husbands v. Pennsylvania,* 395 F.Supp. 1107 (E.D. Pa.1975); *Booker v. Special School Dist. No. 1, Minneapolis, Minn.,* 351 F.Supp. 799 (D.Minn.1972); *Spangler v. Pasadena City Board of Education* 311 F.Supp. 501 (C.D.Calif. 1970).

8. The District Court found in several instances that the segregative results were not only foreseeable, but that the defendants had conscious knowledge of the likelihood of such results, particularly with respect to faculty assignment, school construction, and the deterioration of Tech High.

gaged in acts or omissions, the natural, probable and foreseeable consequence of which is to bring about or maintain segregation.[9] When that presumption arises, the burden shifts to the defendants to establish that "segregative intent was not among the factors that motivated their actions." *Keyes v. School District No. 1,* 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973).

Two other Circuits have recognized a presumption based on the natural, probable and foreseeable consequences test. *Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21, supra* 512 F.2d at 50–51; *Oliver v. Michigan State Board of Education, supra* 508 F.2d at 182. The Second Circuit reasoned:

> * * * [W]e believe that a finding of *de jure* segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. * * *

> To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible of proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. See

*Palmer v. Thompson,* 403 U.S. 217, 224–25 [91 S.Ct. 1940, 29 L.Ed.2d 438] * * * (1971); and see *Keyes v. School District No. 1, supra* 413 U.S. [189] at 233–34 [93 S.Ct. 2686, 37 L.Ed.2d 548] * * * (Powell, J., concurring). It is even harder to find the motivation of local citizens, many of whom would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor.

> * * * * * *

> Speaking in *de jure* terms does not require us, then, to limit the state activity which effectively spells segregation only to acts which are provably motivated by a desire to discriminate. See *Wright v. Council of City of Emporia, supra* 407 U.S. [451] at 461–62 [92 S.Ct. 2196, 33 L.Ed.2d 51] * * *. Aside from the difficulties of ferreting out a collective motive and conversely the injustice of ascribing collective will to articulate remarks of particular bigots, the nature of the "state action" takes its quality from its foreseeable effect. The Fourteenth Amendment is not meant to assess blame but to prevent injustice.

*Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21, supra* 512 F.2d at 50 (Footnotes omitted.). *Cf. Morgan v. Kerrigan,* 509 F.2d 580, 588 (1st Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).[10]

---

**9.** The use of presumptions in civil rights cases is not a novel one. *See Keyes v. School District No. 1, supra* at 209, 93 S.Ct. 2686. *See also* Comment, *Unlocking the Northern Schoolhouse Doors,* 9 Harv.Civ.Rights Civ.Lib. L.Rev. 124, 141 (1974). As the Supreme Court said in *Keyes*:

> * * * In the context of racial segregation in public education, the courts, including this Court, have recognized *a variety of situations* in which "fairness" and "policy" require state authorities to bear the burden of explaining actions or conditions which appear to be racially motivated. Thus, in *Swann* [Swann v. Charlotte-Mecklenburg Board of Education] 402 U.S. [1] at 18 [91 S.Ct. 1267, 28 L.Ed.2d 554] * * * we observed that in a system with a "history of

segregation," "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown." * * * Nor is this burden-shifting principle limited to former statutory dual systems. * * *

*Keyes v. School District No. 1, supra* at 209–210, 93 S.Ct. at 2698 (Emphasis supplied.).

**10.** In *Bradley v. Milliken,* 338 F.Supp. 582, 587, 592 (E.D.Mich.1971), *aff'd in part and vacated in part,* 484 F.2d 215 (6th Cir. 1973), *rev'd on other grounds,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), the District Court found

We have previously used language which supports the use of a presumption in cases like this one:

> * * * Simply to say there was no intentional gerrymandering of district lines for racial reasons is not enough. As Mr. Justice Harlan once observed, "[T]he object or purpose of legislation is to be determined by its natural and reasonable effect, whatever may have been the motives upon which legislators acted." New York ex rel. Parke, Davis & Co. v. Roberts, 171 U.S. 658, 681 [19 S.Ct. 58, 43 L.Ed. 323] * * * (1898) (dissenting opinion). * * *

*Haney v. County Board of Education of Sevier County, Ark.,* 410 F.2d 920, 924 (8th Cir. 1969).

■■■ Because the District Court failed to recognize such a presumption, it gave insufficient effect to its own factual findings. We conclude that, in five decision-making areas, the appellants produced substantial evidence that the defendants' actions and inactions in the face of tendered choices had the natural, probable and foreseeable consequence of creating and maintaining segregation. The five areas include faculty assignment, student transfers, optional attendance zones, school construction, and the deterioration of Tech High. The proof in each area was sufficient in and of itself to trigger the presumption of segregative intent.[11] We also conclude that the defendants failed to carry their burden of establishing that segregative in-

tent was not among the factors which motivated their actions. Accordingly, we hold that the segregation in the Omaha public schools violates the Constitution and must be "eliminated root and branch." *Green v. School Board of New Kent County,* 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

## III. THE EVIDENCE ESTABLISHING INTENTIONAL SEGREGATION.

### A. FACULTY ASSIGNMENT

The history of faculty assignment in the Omaha public schools demonstrates that the faculty segregation detailed in Part I of this opinion resulted from intentional racial discrimination. The Omaha school district hired its first two black teachers in 1940–41, assigning them to majority black elementary schools. During the next twenty-three years, every black teacher hired by the District was assigned to a majority black school. As of 1961–62, the 57 black teachers employed by the District were assigned to seven majority black schools, and eighty majority white schools did not have a single black teacher. No black teachers were assigned to the secondary level until 1959–60, when seven were assigned to Mann Junior High, which opened as the first majority black secondary school, with a 71% black enrollment. No black teachers were assigned to the high school level until 1963–64, the first year in which a major-

---

unconstitutional segregation based on a test of natural, probable and foreseeable consequences. The Supreme Court noted this, *Milliken v. Bradley, supra* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d at 1080, and affirmed that portion of the District Court's opinion, stating that, "under our decision last Term in *Keyes* * * * the findings [of *de jure* segregation] appear to be correct." *Id.* 418 U.S. 717, 94 S.Ct. at 3124, 41 L.Ed.2d at 1087 n.18.

11. In light of the conclusive evidence of intentional segregative practices by the school district, we have not addressed ourselves to the appellants' contention that the public and private racial discrimination in housing provides an alternate ground for ordering all-out school integration. However, we do subscribe to the Fourth Circuit's reasoning:

* * * If residential racial discrimination exists, it is immaterial that it results from private action. The school board cannot build its exclusionary attendance areas upon private racial discrimination. * * *
*Brewer v. School Board of City of Norfolk, Va.,* 397 F.2d 37, 41–42 (4th Cir. 1968) (en banc). *See also United States v. Board of Sch. Com'rs of Indianapolis, Ind., supra* 474 F.2d at 85–86, 88; *Kelly v. Guinn, supra* 456 F.2d at 106 n.7; *Spangler v. Pasadena City Board of Education, supra* 311 F.Supp. at 522. *Cf. Milliken v. Bradley, supra* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d at 1097 (Stewart, J., concurring); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 7, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Johnson v. San Francisco Unified School District, supra* 500 F.2d at 351.

ity black high school existed. Two black teachers were then assigned to Tech High (51% black), and one was assigned to North (9% black).

 In light of the foregoing evidence, the District Court properly found that, from 1940 to "the early 1960's," the school district had

> * * * a policy of placing black teachers in majority black schools only, and also had a policy of confining qualified black secondary teachers to the elementary grades. * * *

*United States v. School Dist. of Omaha* [*Omaha II*], 389 F.Supp. 293, 318 (D.Neb.1974).[12]

However, it erred in finding that the segregative placement policies were "discarded in approximately 1963" and that

> * * * substantial progress has been made in eradicating the effects of these policies. This has been due in large measure to affirmative action taken by the School District not only as to placement but also as to hiring.

*Id.* 318–319.

For the record demonstrates that, although the "affirmative action program" brought more black teachers into the system, the racially discriminatory assignment policies were continued. Of 81 new black teachers hired between 1963

and 1969, 67 were assigned to majority black schools. In 1972–73, 82% of all black teachers continued to be assigned to schools having a black enrollment exceeding 25%, even though such schools comprised only one-fourth of the total number of schools in the District. In that year, fifty-one, or more than half, of the District's approximately ninety-eight schools still did not have a single black faculty member. *Compare Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 19–20, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *United States v. Montgomery County Board of Education,* 395 U.S. 225, 232–233, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); *Berry v. School Dist. of City of Benton Harbor, Mich.,* 505 F.2d 238, 240–241 (6th Cir. 1974); *Booker v. Special School Dist. No. 1, Minneapolis, Minn.,* 351 F.Supp. 799, 804–805 (D.Minn.1972).

 Since it was established that the faculty was segregated on the basis of race—the natural, probable and foreseeable consequence of which was to identify some schools as "black schools" —a presumption of segregative intent arose, and the burden shifted to the defendants to prove that segregative intent was not among the factors which motivated their decision making.[13] This presumption was not rebutted in the record.[14]

---

**12.** The deliberate racial discrimination in faculty assignment was, in and of itself, a violation of the fourteenth amendment. *Morgan v. Kerrigan, supra,* 509 F.2d at 595.

**13.** The Supreme Court has indicated that proof of faculty segregation raises a presumption that the entire system has been segregated as a result of intentional action. *See Swann v. Charlotte-Mecklenburg Board of Education, supra* 402 U.S. at 18, 91 S.Ct. 1267. As the Ninth Circuit has noted:

> * * * [T]eacher assignment is so clearly subject to the complete control of school authorities unfettered by such extrinsic factors as neighborhood residential composition or transportation problems, that the assignment of an overwhelmingly black faculty to black schools is strong evidence that racial considerations have been permitted to influence the determination of school policies and practices. * * *

*Kelly v. Guinn, supra* 456 F.2d at 107. *See also Kemp v. Beasley,* 389 F.2d 178, 190 (8th Cir. 1968); *Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 808–809. *Cf. Cato v. Parham,* 403 F.2d 12, 15 n.7 (8th Cir. 1968).

**14.** The school district's explanation for faculty segregation was a belief that black "role models" should be assigned to teach black children. This explanation is not sufficient to rebut the presumption for three reasons. First, such a belief is unacceptable as a justification for racially discriminatory practices, since it is contrary to the factual underpinnings of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *See Cato v. Parham, supra* 403 F.2d at 15 & nn.6 & 7; *Smith v. Board of Education of Morrilton Sch. Dist. No. 32,* 365 F.2d 770, 782 (8th Cir. 1966). *Cf. Morgan v. Kerrigan, supra* 509 F.2d at 596; *Oliver v. Michigan State Board of Education, supra* 508 F.2d at 185.

## B. STUDENT TRANSFERS

Prior to 1963–64, students in the District could transfer to another school only for reasons of health or hardship. In March of 1964, the school board initiated a new transfer policy. That policy, which continued in effect through the trial,[15] allowed any student to transfer if: (1) the student's achievement level was at least equal to the average achievement level of the receiving school; (2) the receiving school was not overcrowded; (3) the student's parents provided the transportation; and (4) the request was a formal one.

■■■ The District Court found that the evidence concerning the transfer policy was not sufficient to establish an intent to segregate students, and premised that ultimate conclusion on its specific findings that: (1) there was "no evidence" that the achievement level and transportation limitations discriminated against black students;[16] (2) the transfer policy was used equally by black and white students and the board did not discriminate in granting requests;[17] (3) the segregative effect of the transfer policy on the school district as a whole was slight, since only about 2.5% of all students in the District obtained "segregative transfers" in the years 1970–72;[18] and (4) the effect of the transfer policy on the predominantly black schools was not sufficient to establish segregative in-

Second, such a belief—if truly held—reinforces rather than undercuts the presumption of segregative intent with respect to students, since it would logically suggest herding black students into their own schools where they could be taught by their proper black role models. The defendants are thus hoist by their own petard.

Third, the school district's explanation is belied by a 1966 report by the Superintendent. That report declared that the ACLU's request for non-white teachers in all Omaha public schools "is currently unrealistic" but that "[t]he climate of our community has been increasingly receptive." This report suggests that the defendants were "effectuating the discriminatory designs of private individuals." *United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1185 n.3 (8th Cir. 1974), *quoting Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir. 1970). That is clearly unconstitutional state action.

15. Counsel for the defendants stated at oral argument that this transfer policy has been abandoned by the present school board, and has been replaced by a policy permitting transfers of right to minority students when the transfer will result in better racial balance. While commendable, the new policy does not affect the issue of intent underlying prior actions, and is relevant only with respect to the remedy. *See United States v. Board of Sch. Com'rs of Indianapolis, Ind., supra* 474 F.2d at 89. Moreover, where, as here, a transfer policy simply gives students the option to choose between identifiably black and white schools, the relief provided is not sufficient. *See Green v. School Board of New Kent County,* 391 U.S. 430, 438–442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

16. A report issued by the Mayor's Bi-Racial Subcommittee on Education in 1966 stated that "[t]he 20 elementary schools with lowest mean grade six reading scores * * * enroll the majority of Negro pupils in Omaha." Similarly, in a 1967 letter to the superintendent, Principal Carl Palmquist of Tech High noted that the school was 60% black and that "most of our student body [is] performing below grade level in all academic areas."

As for the transportation limitation, the only evidence of record shows that black per capita income was 63% that of whites in Omaha in 1959. No recent data on income was submitted.

17. In its earlier opinion denying a preliminary injunction, however, the court had noted that it

* * * appears that some black students were denied access to a majority white school (Lewis and Clark) for the school year 1970–71 for the reason that it was overcrowded, whereas at the same time some white students were allowed to transfer from majority black schools into that school. *United States v. School Dist. of Omaha [Omaha I],* 367 F.Supp. 179, 193 (D.Neb.1973). In its final opinion, the court did not mention this.

18. The court uses "segregative transfer" to mean those transfers which permit "a student to change to a school in which students of his race are in a percentage at least ten per cent greater than in the school in his zone of residence." *Omaha II, supra* 389 F.Supp. at 312. In 1971–72, 80% of the whites in the District could not possibly have obtained a "segregative transfer," since they already attended schools less than 10% black. Since 2.5% of the total white pool did obtain such transfers, one out of every eight white students who *could* seek a "segregative transfer" obtained one. Moreover, the figures for the predominantly black schools show that a much higher proportion of the whites assigned to those schools were fleeing by means of the transfer policy. *See* p. 540, *infra.*

tent. As noted in the footnotes, the first three findings are tenuous. We need not directly confront them, however, since we conclude that the fourth finding is clearly erroneous. The evidence presented on transfers granted in 1970–71 and 1971–72 shows that the effect of the transfer policy on the majority and predominantly black schools was profound.

The granting of a transfer request to a white student was virtually automatic. No more than 2% of the white segregative transfer requests were denied in the two school years.

In 1970–71, almost 30% of all white students (318 of 1086) assigned to the twelve predominantly black elementary schools transferred from those schools to predominantly white elementary schools. In 1971–72, this figure was 32% (338 of 1039). The magnitude of the white student flight is further demonstrated by the much smaller figures for black students leaving the same schools: only about 1.5% of the black students transferred out of the twelve predominantly black elementary schools in the same period.

The impact at the junior high level was even greater. In 1970–71, 61% (92 of 150) of the white students zoned to attend the two majority black junior high schools transferred out. In 1971–72, the figure was 71% (154 of 218). During those same years, no more than 7.5% of black students transferred out.

The evidence concerning the one predominantly black high school, Tech, shows a similar pattern. Although only 16% of all white high school students were zoned to attend Tech (90% black) or Central (25% black), over 50% of all transfers granted to white high school students during the two-year period were transfers from this joint attendance zone. Virtually all white South High alone received 250 white students from the Tech/Central zone in 1970–71, and 315 such students in 1971–72.

The foreseeable and actual result of the transfer policy was to increase the segregated nature of almost all of the majority black schools in the District. Accordingly, as was true with the evidence of faculty discrimination, a presumption of segregative intent arose.[19] That presumption was not rebutted.[20]

## C. OPTIONAL ATTENDANCE ZONES

In 1950, the District began a gradual process of converting its elementary schools from Kindergarten through eighth grade (K–8) to Kindergarten

---

**19.** Other courts have noted that a transfer policy having segregative effect may be strong evidence of unconstitutional segregation. *See Morgan v. Kerrigan, supra* 509 F.2d at 590; *Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 804, 808; *Spangler v. Pasadena City Board of Education, supra* 311 F.Supp. at 520–521.

**20.** The evidence indicated that the officially sanctioned white student flight was not only foreseeable but was known to the defendants in the day-to-day administration of the policy. First, as the District Court found, the school board granted some transfer requests which were explicitly based on racial factors. For example, the following requests for transfers were granted:

My daughter, Alice, is now going to Clifton Hill School. I would like to request a transfer for her to Fontenelle School for the next school term. She said the reason she wants to transfer is because there are too many Negroe [sic] children in her class. * * *

* * * [Request permission to attend Sherman instead of Mann] Because its [sic] a good school and I don't think it right for a girl to go to a considerable Negro school without some of her friends * * *.
*Compare Spangler v. Pasadena City Board of Education, supra* at 520.

Second, in 1969, two years before the white student flight shown in the evidence, concern over the obviously segregative effect of the transfer policy had caused Legislative Bill 1042 to be introduced into the Nebraska Legislature. That bill, which died in committee, would have prohibited racially segregative transfers in the Omaha School District. The assistant superintendent in charge of administering the transfer policy, Dr. Hlavac, appeared before a committee of the legislature to testify in opposition to the bill.

Third, despite the capacity limitation in the transfer policy, large numbers of white students were allowed to transfer to South High from the Tech/Central zone at a time when Tech had unused capacity of close to 1,000 and South was seriously overcrowded.

through sixth grade (K–6), for the purpose of establishing a junior high system. The seventh and eighth graders released from the elementary schools fed the junior high schools. Although the story is a complicated one, the conversion was achieved in a manner which minimized the necessity of assigning white seventh and eighth graders to the two identifiably black junior high schools: Mann and Tech. Two basic techniques brought about this result:[21] (1) delaying the conversion of predominantly white K–8 schools which would be logical feeders for Mann or Tech; and (2) granting options to the seventh and eighth graders in those schools to attend more distant identifiably white junior high schools, when the conversion did take place.

Tech (54% black in 1963–64) was the closest junior high to five predominantly white K–8 schools: Saunders (0% black), Walnut Hill (2% black), Mason (4% black), Jackson, (0% black), and Yates (0.3% black). Mann (88% black in 1963–64) was the closest junior high to two other predominantly white K–8 schools: Pershing (0% black) and Sherman (0.2% black).

Saunders, Walnut Hill and Mason were converted to K–6 in the period from 1964–65 to 1967–68. No part of their zones was assigned exclusively to Tech Junior High. Instead, the District created "optional attendance zones," allowing seventh and eighth graders from those schools to choose between attending Tech Junior High—more than 60% black when the options were created—and more distant, identifiably white junior high schools. When the options were created, Tech Junior High had at least 128 vacant seats and, because it was located in the large Tech High School building, which had declining enrollment, additional space could have been made available. The foreseeable and actual impact of the optional zoning policy was irrefutably segregative. In 1971–72, the one year for which data is available on the operation of the options, 111 students chose to attend Lewis and Clark (1.7% black), 53 chose to attend Norris (0.7% black), and 5 chose Tech Junior High (91% black). Had these students, virtually all of whom were white, been assigned directly to Tech, the enrollment of that school would have been 73% black, rather than 91% black in 1971–72.[22]

Conversion of the other two predominantly white K–8 schools near Tech Junior High was further delayed. Jackson elementary continued K–8 throughout the trial, when it was 0.5% black. Yates elementary school, located only five blocks from Tech Junior High, continued K–8 until 1970–71. Even then, the conversion of Yates had been delayed for one year because of parental opposition which Dr. Hlavac, the assistant superintendent, openly attributed to racial prejudice. The conversion of Yates was a pyrrhic victory for integration for two reasons. First, in the summer of 1970, just before the Yates seventh and eighth graders were assigned to Tech Junior High, Dr. Hlavac's office approved transfer requests for 30 of the approximately 35 white students in that group, allowing them to attend identifiably white junior

---

21. In 1963–64, only fourteen of the original forty-six K–8 schools had not been converted to K–6. Seven of them were not located near Mann or Tech, and they were converted to K–6 in the 1964–65 school year. All or part of their zones were assigned exclusively to one or more nearby junior high schools (not Mann or Tech), and no optional attendance zones were created. The remaining seven K–8 schools were the ones discussed in the text—located so that the nearest junior high was Mann or Tech. All received unique treatment in the conversion process or were not converted.

22. In addition, if the 103 white students who obtained transfers out of Tech Junior High in that year had remained at Tech, the percentage of black enrollment would have fallen to 63%. Thus, the difference between a 63% black Tech Junior High and a 91% black Tech was directly attributable to the combination of the two policies of special transfers and optional zoning. Had Jackson been converted to K–6, and its students assigned to Tech, the percentage would have approached 50%.

high schools. Second, Tech Junior High was closed after the 1971–72 school year. The Yates attendance district was bisected in 1973–74, so that a portion of its seventh and eighth graders was assigned to overwhelmingly black Mann Junior High, and the other portion was assigned to predominantly white Lewis and Clark. No more than 20 new white students were enrolled at Mann as a result of the closing of Tech Junior High.

The two virtually all white K–8 schools located closest to Mann Junior High, Pershing and Sherman, continued as K–8 throughout the trial, despite the conversion policy, available space at Mann, and the fact that neither school had the enrollment or the facilities which the system considered appropriate for a junior high program.

■ The proof of the foregoing actions by the school board, given the foreseeable segregative impact, raised a presumption of segregative intent.[23] The District Court reasoned that any inference of segregative intent—presumptive or otherwise—was rebutted because of two findings: (1) that an optional zone created for a portion of the Druid Hill elementary area had an "integrative effect," thus showing that the defendants acted without reference to racial factors; and (2) that the optional zones were "necessary and reasonable" for Walnut Hill, Mason, and Saunders. For the reasons stated below, we conclude that the presumption was not rebutted.

The Druid Hill option, allowing students in a predominantly black portion of that elementary zone to attend either Mann or McMillan Junior High schools was created in 1967–68. Prior to that time, students in the area had been zoned to attend predominantly white McMillan; the option gave them the opportunity to choose to attend 98% black

Mann. Giving students in a predominantly black area a new choice of attending a predominantly black junior high rather than continuing their attendance in a white school does not have an "integrative effect."

The Walnut Hill option gave seventh and eight graders the option to attend Norris (3.3 miles distant), Lewis and Clark (2.5 miles) or Tech (1.3 miles). The defendants urge that this was "reasonable and necessary" because the junior high to which the Walnut Hill students would ordinarily have been assigned, Monroe, was overcrowded. This is a *non sequitur.* The school board consistently defended its actions throughout trial on the basis of geographical zoning. If the children from Walnut Hill could not be assigned to the most logical school, Monroe, the next most logical school was surely not Norris or Lewis and Clark, but the considerably closer and underutilized Tech. At the very least, the overcrowded nature of Monroe does not provide a reason for the defendants' decision to assign *no part* of the Walnut Hill attendance area exclusively to Tech.

■ The Saunders option gave seventh and eighth graders the option to attend Tech (1 mile), Norris (2.2 miles) or Lewis and Clark (2.5 miles) in 1964–65. The District Court found this "reasonable and necessary" because "enrollments at Technical Junior High were up and enrollments at Lewis and Clark were down." *Omaha II, supra* 389 F.Supp. at 307. The record is to the contrary. It shows that, in 1964–65, Lewis and Clark was operating with 88 students less than stated capacity and Tech was down 142 students from stated capacity. The 25 to 30 seventh and eighth graders from Saunders could easi-

---

**23.** Other cases have found optional attendance zones in fringe communities to be strong evidence of unconstitutional segregation. *See Oliver v. Michigan State Board of Education, supra* 508 F.2d at 183–184; *Brinkman v. Gilligan, supra* 503 F.2d at 695–696; *United States v. Board of Sch. Com'rs of Indianapolis, Ind., su-* pra 474 F.2d at 86; *Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 804; *Spangler v. Pasadena City Board of Education, supra* 311 F.Supp. at 508 n.8; *Hobson v. Hansen,* 269 F.Supp. 401, 415–417, 499–501 (D.D.C.1967), *aff'd as construed,* 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

ly have been absorbed at the much nearer Tech Junior High.[24]

■ In sum, we conclude that the reasons advanced by the school district to justify the adoption of optional attendance zones for seventh and eighth graders in the predominantly white elementary zones on the border of the black community are not sufficient to rebut the presumption of segregative intent.[25]

## D. SCHOOL CONSTRUCTION

The District Court found that, from 1951–73, thirty-nine new schools or additions were constructed, of which thirty-seven opened either predominantly black or white, and that all twenty-one buildings or additions constructed from 1964 through 1973 opened either predominantly white or black. More specifically, between 1951 and 1973, nineteen schools opened 100% white, fourteen more opened 98% white, and two more opened 93% or more white. At the same time, two new structures opened 94% or more black, one opened 82% black, and one opened 71% black. Only one school in the twenty-two year span opened as truly integrated; that was Indian Hill elementary school, with 28% black enrollment, and that school is located in an area of the city which is entirely separate from the major black community in the "Near North Side."

A specific example of the racial impact of the building policies was the construction of Martin Luther King Middle School. Clifton Hill seventh graders (predominantly black) had traditionally attended majority white Monroe Junior High. After King was constructed, they were reassigned to that school, which opened 82% black. Leaders in the black community protested against this segregative impact and appellants sought a preliminary injunction in this action to restrain the building of King. In its order denying the preliminary injunction, the District Court noted:

> * * * The evidence supports the view that apparently some white students live closer to King than do blacks, yet those whites are allowed to go to a predominantly white school while requiring blacks who live farther from King, to attend that institution.

*Omaha I, supra* 367 F.Supp. at 185.[26]

■ On the basis of the foregoing record, the evidence was sufficient to establish a presumption of segregative intent.[27] Nothing in the record served to rebut that presumption.[28]

---

24. We accept the District Court's conclusion that Mason seventh and eighth graders had to be given an option to attend Tech, Norris or Bancroft, because of commercial areas and extensive interstate highway construction between the students and Tech. We conclude, however, that this is not sufficient, standing alone, to establish that segregative intent was not among the factors that motivated the school board's actions.

25. Indeed, we find the elaborate system of delayed conversion, optional zones, and the closing of Tech Junior High to be inexplicable unless in furtherance of a single coherent policy: the unwillingness to assign white students to schools perceived as black, the "neighborhood school" or any other policies notwithstanding. *See Morgan v. Kerrigan, supra* 509 F.2d at 588. *Cf.* note 28, *infra.*

26. The District Court did not deal with this earlier finding or, for that matter, with the construction of King school in its final opinion.

27. In other school segregation actions, more limited showings have warranted relief. *See, e. g., Milliken v. Bradley, supra* 418 U.S. 717, 94 S.Ct. 41 L.Ed.2d at 1080–1081; *Morgan v. Kerrigan, supra* 509 F.2d at 587; *United States v. Board of School Com'rs of Indianapolis, Ind., supra* 474 F.2d at 87–88; *Davis v. School District of City of Pontiac, Inc., supra* 443 F.2d at 576. *See also Swann v. Charlotte-Mecklenburg Board of Education, supra* 402 U.S. at 21, 91 S.Ct. 1267, recognizing that "the existence of a pattern of school construction and abandonment is * * * a factor of great weight."

28. The defendants argue that their construction decisions are explained by adherence to a neighborhood school policy. However, the school district had no such consistent policy with respect to the black schools in Omaha and the schools on the fringe of the black community. Time and again, the policy—if one existed—was discarded whenever it would have had an integrative effect: the defendants

## E. THE DETERIORATION OF TECH HIGH SCHOOL

In 1973–74, Tech High had an enrollment which was 96% black. Because it shared a common attendance zone with Central—the only joint attendance zone in the District—no student had to attend Tech High. Only 710 students chose to enroll in that year, despite its capacity of 2,475. It was the black high school in Omaha.

Tech High is located in a white neighborhood, close to the southern boundary of the black community. It opened in 1923 as a vocational and college prep school. From 1936–45, it had the largest student body in the District, with a peak of 3,771, and it was predominantly white. Starting in 1950, the black enrollment at the school increased markedly, from 17% in 1950 to 51% in 1963 to 96% in 1973. Simultaneously, it experienced a steady decline in total enrollment. The District Court found that, during this period, Tech developed a large unused capacity at the same time as South and Benson were seriously overcrowded.[29] The school board's solution to overcrowding in adjacent predominantly white high schools was to construct additions at Benson, North and South in the late 1950's and early 1960's, and to build Bryan, Burke and Northwest High schools. Boundary adjustments were necessary when the three new schools opened, just as they would have been if space at Tech had been used.

Whatever the initial reasons for the adoption of the joint Central/Tech attendance zone, there was evidence that Tech's continued status as a school which no one had to attend was at least in part due to perceived white community opposition to a compulsory attendance zone which would force them to send their children to a black Tech High.[30] The result of the joint attendance zone was that, in 1973–74, only twenty-two white students attended Tech, despite the fact that all of the white high school students in the District could have chosen to attend Tech under the "open school" policy, and despite the fact that the Tech/Central zone encompassed all or part of twelve identifiably white elementary attendance areas.

As the enrollment at Tech declined, and the proportion of black students increased, certain course offerings were dropped, and extracurricular activities were curtailed. In particular, electronics was dropped from the curriculum, and its instructor was transferred to predominantly white Benson, which was located in an adjacent attendance area and was overcrowded. At the same time, courses

---

riddled it with exceptions, including a virtually automatic transfer policy, optional attendance zones in fringe communities, a shared attendance zone precluding anyone from being compelled to attend the only black high school (Tech), and geographically suspect assignment practices for predominantly black King Middle Schools. It is an understatement to say, as the Supreme Court found in *Keyes v. School District No. 1, supra* 413 U.S. at 212, 93 S.Ct. at 2699, that "the 'neighborhood school' concept has not been maintained free of manipulation." *See also Oliver v. Michigan State Board of Education, supra* 508 F.2d at 184–185; *Morgan v. Kerrigan, supra* 509 F.2d at 584 n.7, 588; *Dowell v. School Board of Oklahoma,* 244 F.Supp. 971, 977 (W.D.Okla.1965), *aff'd,* 375 F.2d 158 (10th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967).

**29.** For example, in 1961–62, Tech (44% black) was 938 under capacity, while enrollment at Benson (0% black) was 155 over capacity. In 1963–64, the year Tech turned majority black, Tech was 682 under capacity, while Benson (0.1% black) was 607 students over capacity. And, in 1970–71, Tech (88% black) was 1,502 under capacity, and Benson (3.3% black) was 599 over capacity. *Compare Morgan v. Kerrigan, supra* 509 F.2d at 586.

**30.** Dr. Fullerton, Assistant Superintendent for Instructional Services, testified that the Committee for the Future of Technical High School, of which he was a member, considered the possibility in 1973 of establishing a compulsory attendance zone for Tech, but was concerned with

* * * a number of factors which will influence attitudes and create animosities, would create reluctance, [and] would tend to * * * create a poor atmosphere in the school community for pupils to learn and teachers to teach.

Asked if he was referring in part to racial prejudice, Dr. Fullerton replied, "Yes."

which the school board felt would be more adequately suited to the needs of Tech's increasingly black enrollment, including culinary arts and auto body shop, were added to the curriculum. Simultaneously, Tech began to serve growing numbers of "special education" students. The criteria used by the defendants to place such students in Tech was an IQ below 85, "emotional problems," and difficulty in learning. Many of these students were disruptive and presented disciplinary problems. At a minimum, of 1,170 students enrolled at Tech in 1970–71, 244 students (21%) were special education students. Only two other high schools had such students in that year: North with 4% and South with 2%. By 1973, the Committee for the Future of Technical High School reported in one of its memoranda: "The consensus was that we now are [a school for special education] except in name."

By 1971–72, Tech High was in a state of disrepair, was ungovernable, and was 91% black. After protests of various kinds, the District repaired and renovated it, changed faculty assignments, and altered the curriculum to offer more individualized instruction. Despite the attempt to shore it up, the preferred recommendation of the Committee for the Future of Technical High School in 1973 was: "Close the school—disperse the students."

The District Court found that the steady decline in enrollment, the constant and severe overcrowding at neighboring schools, and the increasingly black makeup of Tech were known to the administration of the Omaha public schools. The court further found that

* * * Mr. Carl Palmquist, the principal at Technical during the 1950's and 1960's, repeatedly notified the Superintendent of Schools and his staff orally and in writing that Technical was in danger of becoming an all-black school.

*Omaha II, supra* 389 F.Supp. at 308.

Nevertheless, the court found that the increasingly segregated nature of Tech High school was not evidence of segregative intent because the defendants showed "a determination * * * to upgrade both the physical plant and the quality of education at this school." *Id.*

■ Assuming the validity of the court's factual finding that the District sought throughout the 1960's and 1970's to provide an excellent education at Technical,[31] the court's conclusion that no segregative intent was shown by the board's actions with respect to Tech High school was premised, at least in part, on the doctrine of "separate but equal" educational facilities. This has not been the law since *Brown v. Board of Education* and "[t]he law can never afford to bend in this direction again." *Haney v. County Board of Education of Sevier County, Ark., supra* 410 F.2d at 926.

■ By focusing on the quality of education at Tech High, the District Court gave insufficient weight to the fact that the defendants' actions in setting up a joint Tech/Central zone, in making Tech a special education school "except in name," in deleting attractive vocational courses such as electronics from the curriculum and substituting courses aimed at meeting black stereotypes,[32] in permitting Tech's enrollment

---

**31.** The "upgrading" to which the court referred did not take place until it had become clear to all concerned that Tech High was destined to become a virtually all black school. The attrition of white students had already been completed, and no amount of physical renovation and curriculum changes would likely bring them back to a school which they did not have to attend. Moreover, the preferred recommendation of the Committee for the Future of Technical High School to close the school does not square with the court's con-

clusion that "the potential for an excellent vocational educational program at Technical has [not] in any way diminished." *Omaha II, supra* 389 F.Supp. at 310.

**32.** We do not mean to criticize the addition of courses which were geared to the needs of the students. However, the deletion of other courses which would have been attractive to whites as well as blacks removed one of the last few incentives for a white student to choose to attend Tech High.

to dip far below capacity, and in assigning most of the black high school teachers to Tech, all combined to result in a high school which was identified as "a 'colored school' just as certainly as if the words were printed across its entrance in six-inch letters." *Kelley v. Altheimer, Arkansas Public School Dist. No. 22*, 378 F.2d 483, 491 (8th Cir. 1967), *quoting Brown v. County School Board of Frederick County, Va.*, 245 F.Supp. 549, 560 (W.D.Va.1965). The result of the defendants' actions in these instances, given the assignment of students to Tech by choice, was not just natural, probable and foreseeable, it was inevitable: a virtually all black and relatively empty school. That result is even more significant when it is recalled that Tech is located in a white neighborhood.

The presumption of segregative intent which arose following proof of the above course of conduct was not rebutted by anything in the record.

## IV. REMEDY.

■ It follows from the foregoing findings that racial discrimination in the Omaha public schools must be eliminated root and branch. We, therefore, remand to the District Court with instructions to it to take those steps necessary to bring about a thoroughly integrated school system in accordance with the guidelines and the timetable set forth below. We recognize that integration will be difficult. The pain of transition is an unfortunate, but inevitable result of deliberate policies which have isolated black Americans from the schools and residential communities [33] of white Americans. Fortunately, the present board of education has indicated a disposition to move toward an integrated school system.[34] We are confident that, when it understands fully the additional steps that need to be taken to achieve integration, it will take those steps.

## A. FACULTY INTEGRATION

The faculty shall be fully integrated by the opening of the 1975–76 school year. A ratio of white to black faculty members shall be established in accordance with the principles set forth in *Swann v. Charlotte-Mecklenburg Board of Education, supra* 402 U.S. at 19–20, 91 S.Ct. 1267, and *United States v. Montgomery County Board of Education, supra.*

## B. STUDENT INTEGRATION

It shall be the responsibility of the board of education to develop a comprehensive plan for integrating the student body. In formulating the plan, the board shall work with the school administration, the state department of education, the parties to this lawsuit, and an interracial committee to be named by the District Court. The burdens of integration shall be borne as equally as possible by blacks and whites in all geographic areas of the District. Because substantial changes in student assignments will be required, and because some schools were damaged by a recent tornado, the planning and implementation of student integration may be done in phases, so long as the ultimate deadline is achieved. Plans for the first phase shall be submitted to the District Court for approval within forty-five days of the issuance of this Court's mandate. The first phase shall be put into operation for the beginning of the 1975–76 school year. A comprehensive plan for completing the process of integration shall be presented to the District Court no later than January 1, 1976. The District shall be thoroughly integrated no later than the beginning of the 1976–77 school year.

The plan for integrating the student body shall be developed and implemented in compliance with the following guidelines:

(1) The reassignment of students currently attending integrated schools shall

---

**33.** *See* pp. 534–535, *supra.*

**34.** *See* note 15, *supra.*

be avoided wherever possible. This policy recognizes the desirability of integrated schools in integrated neighborhoods. *See Swann v. Charlotte-Mecklenburg Board of Education, supra* at 28, 91 S.Ct. 1267. It makes little sense to reassign students now attending integrated schools in their neighborhood to schools in other sections of the city. For this purpose, schools with black enrollments between 5% and 35% are to be considered integrated.[35]

(2) In schools where the black enrollment is presently below 25%, such enrollment shall not be increased above the 25% level by operation of the plan. This policy will discourage the labeling of additional schools as "black," will hopefully discourage "white flight," and will further integration in the District.

(3) The ratio of black to white students at schools which presently have a black enrollment between 25% and 35% shall not be significantly increased by operation of the plan, and in any event, the outer limit shall be set at a level not to exceed 35% black enrollment.

(4) The attendance policies at schools where black enrollment exceeds 35% shall be altered so that black enrollment at such schools drops to a level not to exceed 35%. *See Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 808. *Cf.* note 3, *supra.*

The integration techniques to be used by the school board in meeting the above guidelines shall consist of those which have been approved by the Supreme Court, including the pairing or clustering of schools, the realignment of school assignment zones, and the relocation of portable classrooms. To the extent that transportation is required to achieve an integrated school system, it shall be paid for by the school district.[36]

No transfers shall be permitted which will have the effect of increasing the segregated nature of either the sending or receiving schools. *See Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 811; *United States v. Board of Education, Independent School District No. 1, Tulsa County,*

---

**35.** As we read the record, in 1973–74, the following elementary schools were integrated under this standard: Belvedere, Central Grade, Field Club, Fontenelle, Highland, Lord, Minne Lusa, Mount View, Rosehill, Walnut Hill, Wakonda, and Yates. Integrated junior high schools included Hale, Indian Hill, and Lewis and Clark. Integrated high schools included Central and Benson.

**36.** It is apparent from the record that assignment of students on a strict neighborhood or geographical basis will not be sufficient to eliminate the segregation which has been found to exist, at least with respect to some schools. The Supreme Court has made clear in unanimous opinions that "[t]he measure of any desegregation plan is its effectiveness." *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971); *Swann v. Charlotte-Mecklenburg Board of Education, supra* 402 U.S. at 25, 91 S.Ct. 1267. To the extent that geographic zoning assignment will not succeed in dismantling the dual system and eliminating all vestiges of state-imposed segregation, the school board is not permitted to rely on that technique. *See Newburg Area*

*Council, Inc. v. Board of Education, Jefferson County, Ky.,* 489 F.2d 925, 931 (6th Cir. 1973), *cert denied,* 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975). *See also United States v. Board of Education, Independent School District No. 1, Tulsa County, Okl.,* 429 F.2d 1253, 1258–1259 (10th Cir. 1970). As the Supreme Court has stated,

> * * * [a]ll things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. * * *
>
> * * * * * *
>
> * * * "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate * * * [w]hen school authorities present a district court with a "loaded game board" * * *.

*Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 28, 91 S.Ct. at 1282. Hence as a practical matter, in Omaha as well as in other large metropolitan areas, "[d]esegregation plans cannot be limited to the walk-in school." *Id.* at 30, 91 S.Ct. at 1283.

**548**

*Okl.,* 429 F.2d 1253, 1260 (10th Cir. 1970). A transfer policy, whereby any student may transfer as of right from a school where his race is in the majority to a school where his race is in the minority, *see* note 15, *supra,* may be included in the plan, with the provision that the school district shall provide the necessary transportation costs.

It shall be the responsibility of the District Court to assure that "future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 21, 91 S.Ct. at 1279. Accordingly, any construction of new schools or additions to old schools other than that contemplated in the plan, shall be submitted to the District Court for approval. *See Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 811.

The District Court shall retain jurisdiction to assure that the plan is one which effectively integrates the entire Omaha school system, and to assure that the plan is in fact being carried out. To assist the court in its monitoring function, the court's order should include reporting provisions, requiring that reports on the operation of the plan be filed periodically with the court for a period of at least three years. *See Cisneros v. Corpus Christi Independent School District,* 467 F.2d 142, 153 n.10 (5th Cir. 1972) (en banc), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973); *Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra* 351 F.Supp. at 811.

It is necessary that school officials should come forward promptly with an acceptable plan for the district court's consideration. The district court is required to remedy the discrimination under an acceptable plan in accordance with the guidelines set forth in this opinion.

Reversed and remanded for further proceedings consistent with this opinion.

The mandate of this Court shall issue forthwith.

Costs shall be taxed against the School District of Omaha.